STROMBERG MOTOR DEVICES CO. v. ZENITH CARBURETOR CO.

(District Court, N. D. Illinois, E. D. February 3, 1915.)

No. 225.

1. PATENTS ⬤⟿297—PERSONS CONCLUDED—INFRINGEMENT SUIT—PERSON PARTICIPATING IN DEFENSE.

A manufacturer of an alleged infringing device is not estopped by an interlocutory decree finding infringement in a suit against a dealer to which it was not a party, although (but not openly and avowedly) it paid the expense of the defense and took an appeal in the name of the defendant; nor is it bound by the final decree where, after the appeal, defendant discharged the attorneys it had employed for him and employed another, who dismissed the appeal and consented to a final decree against his client, waiving an appeal therefrom.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 481–488; Dec. Dig. ⬤⟿297.]

2. PATENTS ⬤⟿328—VALIDITY AND INFRINGEMENT—CARBURETOR.

The Ahara patent, No. 684,662, for a carburetor, and the Richard patent, No. 791,501, for an improvement thereon, both held valid and infringed by two forms of carburetors made and sold by defendant, but not infringed by a third.

3. PATENTS ⬤⟿328—VALIDITY AND INFRINGEMENT—CARBURETOR.

The Sturtevant reissue patent, No. 12,611, and the Anderson patent, No. 1,063,148, each for a carburetor, held valid, but not infringed.

In Equity. Suit by the Stromberg Motor Devices Company against the Zenith Carburetor Company. On final hearing. Decree for complainant.

Silas H. Strawn, Arthur H. Boettcher, and Charles A. Brown, all of Chicago, Ill., for complainant.

Frank H. Culver and Edward Rector, both of Chicago, Ill., Clarence P. Byrnes, of Pittsburgh, Pa., and William M. Swan, of Detroit, Mich., for defendant.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

SANBORN, District Judge. This is a suit similar to Stromberg Co. v. John A. Bender Co., decided in this court February 13, 1914, and reported in 212 Fed. 419. It is brought on the Ahara patent, No. 684,662, October 15, 1901, and the Richard patent, No. 791,501, June 6, 1905, which were in the Bender Case, as well as the Sturtevant reissue of February 19, 1907, No. 12,611, and the Anderson patent, No. 1,063,148, May 27, 1913, applied for July 26, 1912.

In the Bender Case the decision turned on the distinction between suction-controlled and gravity-controlled nozzles, and infringement was found because it was thought the Zenith device there shown, like Ahara, was not gravity-controlled in its secondary nozzle. This case must also turn on the same distinction so far as the Ahara and Richard patents are concerned.

The Zenith device which was decided to be an infringement in the Bender Case was made with a circular air-inlet in the U-shaped tube of one-eighth inch. This was decided in that case to be so small as not to prevent subatmosphere in the U-tube, and it was supposed by the court, and so decided, that subatmosphere was likewise created in the U-tube of Ahara. Thus it was concluded that the two devices worked substantially the same, Zenith being only an improved extension of Ahara, and infringement was therefore adjudged. It was also thought that, if Zenith had followed the true Baverey principle, there would have been no infringement.

In the present case the proof as to infringement shows substantially the following: Three devices made by defendant were produced, Nos. 1, 2, and 10. No. 1 has four sixteenth inch vent holes (which are equal in area to one eighth inch); No. 2 shows two three-sixteenth inch vents; and No. 10 one eighth inch vent. In other respects the devices are identical with those held to infringe in the Bender Case, except that a later form has an additional restriction on the air entering the starting well. No. 1 was made between August, 1911, and August, 1912, and has four small holes as air-intakes. No. 2 was made between March, 1913, and April 19, 1914, when it was sold. No. 10 was made in March, 1912, was later discontinued, and No. 2 substituted for it.

At the time this suit was begun No. 2 was being made, and is the one defendant is furnishing to customers. The other two types have been discontinued, but a few of them may have been still sold at the filing of the bill. Before that time the device had so changed as to contain two vent holes in the U-tube, each of three-sixteenths inches diameter. This type was first made in December, 1913, or January, 1914. In June, 1913, the enlargement of the vents was begun. The particular device shown as Exhibit No. 2 in evidence was sold in April, 1914, just after the interlocutory decree in the Bender Case, with two eighth inch vents, having been originally sold in February, 1914, returned to the factory, and resold in April without change. The defendant has not intended to sell any devices since that decree with less than two three-sixteenths vents. So the matter practically comes down to the question whether carburetors with two three-sixteenths vents, said to create no vacuum at all in the U-tube, should be held to infringe.

By referring to the small accompanying diagrams it is obvious that during normal operation there is partial vacuum in the Ahara U-tube. Mr. Miller says:

"I concede that the subatmosphere in Ahara's well may be very considerable, but I do not think the amount of it entered into Ahara's calculations. I want to make myself clear on that, and I confess to do so by referring to Anderson. I think Anderson intended to get for a given purpose a subatmosphere. I think Ahara has a subatmosphere, but I do not think it was for any intentional purpose, and I do not think that it was a regulatable one. I have stated many times that when the Ahara device is operating on a multicylinder engine the suction affects the amount of fuel which can drop from the L-tube to the U-tube."

Miller also states that there is practically no suction in that form of the Zenith device shown in Fig. 3 of the Zenith catalogue of 1911. In other words, the U-tube nozzle in Ahara is affected by suction, and the Zenith is not, so far as Fig. 3 is concerned. In the Bender Case it was thought that both the actual devices of Ahara and Zenith were suction-controlled, but that if the latter were not there would be no infringement. It is, however, insisted by complainant that the forms of the Zenith device in evidence (Nos. 1, 2, and 10) work just like Ahara on a variable speed, multi-cylinder engine.

The first cut shows the Zenith device with the suction nozzle at

the left and the gravity nozzle on the right. The second shows the Ahara device, both nozzles being suction-controlled, the first because it is a tube of uniform size, and the other because it is not open to the atmosphere. The dotted lines show the fuel level.

[1] *The Question of Estoppel.* A preliminary question is presented, whether the Zenith Company is bound by the decree in the Bender Case. The Zenith Company was wholly in control of the defense of the Bender Case up to the interlocutory decree, and until after an appeal from that decree had been taken by the Zenith Company in Bender's name. Down to that time it employed Bender's solicitor and counsel, paid them, and bore all expenses of every kind without any expense to Bender. But such acts on its part were concealed as far as possible; they were not "open and avowed," as those words are used in the authorities.

While that appeal was pending, however, a radical change in the situation occurred. Bender was still the sole nominal defendant, in absolute control if he desired to assert it. He discharged the attorneys who had been provided for him, employed a new attorney, and dismissed the appeal taken in his name by the Zenith Company. Then, as the final step, Bender's new attorney consented to the entry of a final decree and waived an appeal therefrom. The Zenith Company was thus entirely excluded from the case before final decree. That decree was by consent, and was directly contrary to its interest. It is not estopped by the interlocutory decree, because finality is essential. Harmon v.

Struthers (C. C.) 48 Fed. 260; Bradley Mfg. Co. v. Eagle Mfg. Co., 57 Fed. 980, 6 C. C. A. 661. It is not concluded by the final decree, because it is not a party of record, and because a consent decree binds no one but the parties thereto. It is apparent that the Zenith Company never did absolutely control the defense, nor was such defense as it did make up to the interlocutory decree an open or avowed one.

The interlocutory decree was entered early in March, 1914, and on March 30th a motion was made by complainant to bring in the Zenith Company as a party defendant to the Bender suit. This was denied. On this date Bender's attorneys were discharged, and a new one substituted, a final consent decree entered, and Bender's appeal dismissed. At the time of the hearing complainant's attorneys suggested or offered in court to Bender's former attorneys that they could appeal if the Zenith Company would appear. Obviously that company on its own initiative could have applied to the court to become a party to the record for the purpose of appeal, so this suggestion by complainant's attorneys amounted to nothing more than that they would not oppose such an application by the Zenith Company. Persons whose interest is affected by a decree may be made parties and allowed to appeal. Sage v. Central Railroad, 93 U. S. 412, 23 L. Ed. 933. This could have been done with respect to either decree.

Because the Zenith Company lost control of the proceedings, the final decree entered by consent of complainant and Bender's new attorney, and the Zenith Company's defense was never open and avowed, so as to make the estoppel mutual between the complainant and the Zenith Company, there is no estoppel. The rule of res judicata does not apply, whatever may be the rule of stare decisis.

Cases holding the "open and avowed" rule are cited by defendant as follows: Lane v. Welds, 99 Fed. 286, 39 C. C. A. 528; Andrews v. Pipe Works, 76 Fed. 166, 22 C. C. A. 110, 36 L. R. A. 139 (this circuit); Cramer v. Singer Mfg. Co., 93 Fed. 636, 35 C. C. A. 508; Singer Mfg. Co. v. Cramer, 109 Fed. 652, 48 C. C. A. 588; Hanks Dental Ass'n v. International Tooth Crown Co., 122 Fed. 74, 58 C. C. A. 180; Lacroix v. Lyons (C. C.) 33 Fed. 437; Plumb v. Goodnow's Adm'r, 123 U. S. 560, 8 Sup. Ct. 216, 31 L. Ed. 268; Litchfield v. Goodnow's Adm'r, 123 U. S. 549, 8 Sup. Ct. 210, 31 L. Ed. 199.

Cases for plaintiff, to the effect that the participation of the Zenith Company made it a substantial party, are cited as follows: Theller v. Hershey (C. C.) 89 Fed. 575 (patent case); National Folding Box & Paper Co. v. Dayton Paper Co. (C. C.) 95 Fed. 991 (patent case); Bemis Car Box Co. v. J. G. Brill Co., 200 Fed. 749, 119 C. C. A. 229 (patent case); Ward v. Clendenning, 245 Ill. 206, 91 N. E. 1028; Bradley Mfg. Co. v. Eagle Mfg. Co., 57 Fed. 980, 6 C. C. A. 661 (patent case); Gilbert v. American Surety Co., 121 Fed. 499, 57 C. C. A. 619, 61 L. R. A. 253; Penfield v. Potts & Co., 126 Fed. 475, 61 C. C. A. 371 (patent case); Confectioners' M. & M. Co. v. Racine E. & M. Co. (C. C.) 163 Fed. 914 (patent case); Bryant El. Co. v. Marshall (C. C.) 169 Fed. 426 (patent case).

[2] *Comparison of Ahara and Zenith.* The validity of the Ahara and Richard patents, including the prior art, has been most fully and

thoroughly presented, from every possible point of view, with an abundance of illustrative charts, including a searching attack upon both of these patents. This will serve to present the questions to the best advantage on review; but, so far as I am concerned, I have seen no reason to change the conclusions reached in the Bender Case as to the validity of these patents. I think Ahara is valid, that Richard is an extension or improvement thereof, and that both should also be sustained here on the rule of stare decisis. This trial has, however, clarified what seem to be the controlling principles of the various devices, making it easier to deal with the question whether the change in the Zenith carburetors has relieved them from the charge of infringement.

The Ahara invention was designed for a constant speed, hit and miss, gas engine. When it is sought to apply it to a changeable speed, multi-cylinder engine, with the exacting demands made upon that type of machine, it should be subjected to a critical examination, and given no more credit than it is fairly entitled to. Under the testimony already recited, supplemented by the Detroit test, and the Grant Park test, it is entirely clear that it is, through a considerable range of its operation, suction-controlled as to its U-shaped nozzle (as well, of course, as to its main nozzle, as in all such devices). It is equally clear that the modified Zenith device No. 2, with the three-sixteenth inlets, is not suction-controlled in its U-shaped tube or nozzle to any substantial degree.

In respect to the principle of the Zenith device the following testimony was given by Prof. Wagner:

"We have in Zenith two jets capable of independent adjustment—one a single jet of the old type, which naturally grows richer as the speed increases; the other the compensating jet, which as I understand is entirely new with Zenith, in which the gasoline delivery is constant, and consequently, if it were mixed with the air alone, the mixture would grow leaner. Now, by so adjusting the relative influence of those two jets, the leaner growing mixture compensates for the richer growing mixture. That is shown by the table."

The ideal carburetor is thus described by Mr. Miller, complainant's expert:

"This compensation, by employing one nozzle, which varies mainly with the suction, and the other nozzle, which varies in less degree with the suction, is one of the important points used in carburetors to-day. In some carburetors, it accomplishes an automatic balancing as between a suction-controlled nozzle and a restricted nozzle, or gravity-controlled nozzle, by which a practically uniform mixture is secured under all working conditions of the engine, whether running very fast or very slow, whether running slow under a heavy load or slow under a light load, or heavy under a heavy load or under a light load. That was an improved result, in that it is the ideal condition that carbureting engineers are trying to attain."

Mr. Miller said (in this case) that the foregoing is a substantially correct quotation from what he said in the Bender trial, where he was referring to and describing the Zenith device.

The Bender decision went upon the theory that an eighth inch hole in the Zenith well would so restrict the U-tube as to create a vacuum therein, and so depart from the principle of the Baverey patent and operate just like Ahara. The vents having now been enlarged, so

that there is no subatmosphere in the well, the Ahara patent is not infringed.

There is a second feature of the Zenith mixer which is claimed to be an infringement of Ahara, and that is the priming device or starting well. This is also claimed to infringe Sturtevant and Anderson, considered further on. This starting device is entirely suction-controlled, in which respect it agrees with Ahara. Defendant insists, however, that this starting well has no constant level reservoir, only a variable level one, and so not within Ahara. For the present I will assume this to be the correct view, and therefore that Ahara is not infringed by the starting well, and consider the matter more fully in connection with the Sturtevant and Anderson patents.

*The Richard Patent.* This was held valid in the Bender Case, and its infringement not considered. This patent is a development of Ahara, and is of quite a limited character. One of the claims in suit reads:

"8. (1) The combination of a storage chamber; (2) a carbureting chamber connected to the engine cylinder; (3) a mixing chamber in the upper portion of said carbureting chamber; (4) a U-shaped receptacle connected to said storage reservoir; (5) suitable air ports for the other arm of said receptacle; (6) suitable air ports for said mixing chamber; (7) means for controlling said ports; (8) a valve above said carbureting chamber (throttle)."

Defendant does not divide its carbureting chamber, nor does it, in the No. 2 device, as shown in the small diagram, control its U-shaped air port, leaving it open as effectively as though its upper end was free. By the old venturi tube it somewhat restricts the lower part of the mixing chamber. Defendant does not use any form of control of the U-tube like the vane shown in the Richard drawings. Claim 10 omits the seventh element (being such means of control), and thus leaves that claim differing from Ahara only in the division of the mixing chamber and throttle. Zenith has no double chamber, and does not control its U-tube; that being also open to full atmosphere. With its narrow character, and general want of adaptability to the ordinary automobile engine, Richard should not, I think, be held infringed by Zenith mixer No. 2; the one now being made and sold.

[3] *The Sturtevant Patent.* This was not in the Bender Case. The original patent dates from 1904, reissued in 1907. This is a combination of two distinct mixers, the main one for ordinary use and the other for very low speed, and being in operation also when the main one is working. The main device is on the principle of Krebs, the air for mixing with the fuel being taken in through a spring-actuated valve, opening by the engine suction. The other one, on the other hand, is like the U-tube of Ahara, except that its nozzle is between the throttle and the engine cylinders, always subject to the engine pull, without in any way being regulated by the throttle. The Sturtevant device is thus described by Mr. Rector:

"It has always been the practice, in the operation of automobiles, to throttle down the engine by nearly, but not quite, closing the throttle valve, when it is desired to stop the car without 'killing' the engine, either for an emergency stop, or 'slow-down,' or to allow the engine to 'idle' while the car is stopped

for a longer period. In so throttling down the engine, by nearly, but not quite, closing the throttle valve, there is always danger, particularly when it is done for the purpose of quickly stopping the car, that the throttle valve will be inadvertently or accidentally closed completely, and the engine thus 'killed.' Every one has seen this happen at street crossings and in traffic-crowded streets in the cities, with consequent annoyance to and interference with adjacent traffic. To guard against such inadvertent and accidental closing of the throttle valve, under such conditions, it has long been a common practice to provide an adjustable stop for the throttle valve, to interfere with the closing movement of the valve and prevent it from being completely moved to closed position. With such provision, the driver of the car may quickly and without exercising any care swing his throttle lever over nearly to closed position, and thus slow down his engine and stop his car, and leave the engine 'idling' if desired, without any danger of 'killing' the engine.

"Now, what Sturtevant proposed to do was to provide another means for preventing such accidental 'killing' of the engine by an inadvertent complete closing of the throttle valve. The means which he provided for this purpose consisted in an auxiliary carburetor, of smaller size, independently connected with the air intake of the engine, and *always in open communication therewith*, and not controlled in any manner by the throttle valve of the main carburetor; in other words, a *double* carburetor—a large or main carburetor, and a small or auxiliary carburetor—wholly independent of each other excepting that both are capable of operating at the same time and simultaneously supplying fuel to the engine. No valve whatever is interposed between the small or auxiliary carburetor and the air intake of the engine, so that said carburetor is always in action when the engine is running, and it is described as being of such size and capacity as to supply the engine with sufficient fuel to keep it *continuously running* at low speed. The throttle valve which is interposed between the main carburetor and the air intake of the engine is wholly independent of the auxiliary carburetor, and has no control whatever over it. When it is open the main carburetor and the auxiliary carburetor both operate (but entirely independent of each other) to supply fuel to the engine; and when it is entirely closed the auxiliary carburetor continues to operate precisely as before."

One theory of infringement is that, by providing a set screw stop at the side of the mixing chamber to prevent the throttle being entirely closed, defendant makes use of the Sturtevant second mixer. Obviously any competent driver must keep the sector arm so that the engine will keep going; and any person capable of running a car would readily think of keeping the throttle always slightly open by the use of a set screw, making it necessary to cut off the spark in order to stop the engine.

The more reasonable theory of infringement is the presence of an auxiliary starting well in the Zenith mixers, which may be thus described: The open air end of the Zenith U-shaped well lies at the side of the mixing chamber, so that one point of the circular edge of the throttle is just opposite the upper end of the well. For a starting device a second well or pipe is placed within the upright leg of the U-shaped well, and extends from a point near the bottom of the well to the top, and is then turned and carried through the side of the well, so as to communicate with the mixing chamber just under the edge of the throttle and closed by it when the throttle is shut tight. When the engine stops, fuel will flow into the bottom of this starting pipe up to the constant level. If the throttle is then opened a little and the engine cranked, the air rushing up through the main supply will carry such vapor from the main jet, and also will pull

up into the mixing chamber the small amount of fuel there stored, and thus give a richer mixture for the starting operation.

Instead of leaving the throttle so it can be fully closed, defendant adopts the common practice of providing an adjustable stop for the throttle, so it will always be at least slightly open, and the engine pull will at all times during operation or idling operate on the start-ing well. But no fuel will be taken in through the latter during this active period, because the bottom of the starting tube is at this time above the fuel level. When the engine stops the starting tube fills up, ready for the early suction strokes of the next start.

The following differences between the Sturtevant extra mixer and the Zenith starting well may be noted: In one the air is supplied through the auxiliary tube, and in the other from the main air supply. One operates all the time, and the other only at the instant of start-ing. In one the engine is started by the auxiliary mixer alone; in the other by the co-operation of main nozzle and starting nozzle. These are important functional differences, and it may be added that the Zenith starting well is not a carburetor at all, merely an auxiliary fuel supply. Sturtevant was not the first to use a double mixer, this having been done by Schumm, No. 482,201, of 1892. While Schumm does not anticipate Sturtevant, still the latter is distinguished from Zenith in all three of the usual tests of infringement—means, opera-tion, and result. Even result is somewhat different, since in Zenith the main nozzle operates at the starting instant along with the other. Sturtevant is clearly valid, but I do not think it infringed. It is aptly characterized by Mr. Miller as "the fool-proof idea of Sturtevant," by which the throttle can be closed without "killing" the engine. But the adjustable stop is within the inventive ability of any one who can run a car.

*The Anderson Patent.* This patent was applied for July 26, 1912, and is a highly specialized development of the earlier forms of the Zenith starting well, together with a complicated carburetor of late type. It is a very ingenious conception, but has not yet gone into any great commercial use. The gist of the invention is the creating and maintaining of a definite vacuum in the auxiliary well or auxiliary carburetor. The auxiliary well is supplied with fuel from a very small passage, and is directly connected with the venturi or pressure inlet, so that (to quote from the claims) there is "a variable subatmos-pheric pressure in said auxiliary reservoir."

Denial of infringement rests on four propositions:

1. The earlier forms of the starting well in Zenith, sold in 1911 and 1912, contained a definite subatmosphere in the starting well and in the U-tube, and this form is also shown in the Horseless Age of November 15, 1911.

2. Anderson's auxiliary well operates all the time, just as in Sturte-vant; otherwise in Zenith.

3. The Zenith starting tube is not "fed from said constant level supply chamber."

4. The Zenith does not have "means for maintaining a definite subatmospheric pressure in said auxiliary reservoir."

As to the first proposition, complainant contends that, although the testimony shows that the earlier forms of Zenith comprehended a vacuum in the U-tube, this feature was merely accidental and purposeless; hence there would be no anticipation under the rule in this circuit declared in General Electric Co. v. Sangamo El. Co., 174 Fed. 141, 98 C. C. A. 175, Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279, and other cases. Anderson adopts as an important feature of his invention the presence of vacuum in the auxiliary well. The No. 1 and No. 10 mixers, which were earlier than Anderson, could not infringe. This leaves No. 2, which has no vacuum in its auxiliary well, but only in its starting well. Here a subatmosphere was always essential, and is not in any sense incidental in Exhibits 1 and 10. Prof. Wagner testified that the vacuum pull is working all the time on the Zenith starting well, but that after the fuel has been pulled out the starting tube does not extend down far enough to touch the fuel again until a period of rest. It is true that he also says that the main difference between Anderson and Zenith is that Anderson has subatmosphere in the well, while Zenith does not; but he is here referring to the auxiliary well, not the starting tube.

It would seem to follow that if any of the Zenith carburetors would infringe Anderson, if his patent had been first, they would anticipate him, because Nos. 1 and 10 were earlier. But this does not meet the questions raised by complainant, since defendant has introduced a valve to restrict the subatmosphere in the starting tube. It not being clear that the Zenith intentionally had a vacuum in its starting well, although there always was a definite one there, anticipation does not appear with the requisite certainty, it seems that it should be held that the earlier forms of Zenith devices should not be held to show "knowledge by others in this country" prior to Anderson.

The second point is that Anderson's well works continuously, as part of his system of furnishing a mixture of variable richness, while the Zenith starting tube is out of commission as soon as the vacuum pull is strong enough to draw down the fuel in the auxiliary well below the bottom of the starting tube. This point is well taken. This is a clear difference in operation.

The third proposition is that the Zenith is not fed from the constant level supply chamber, but from the auxiliary well, which is itself fed directly from the fuel chamber. The gist of this proposition is about the same as the last, which is that when the Zenith starting tube is not supplying fuel it is getting none to supply, either from the fuel chamber or elsewhere. In this view the point is purely technical, although it is true that the two devices in this respect show a difference in operation.

The last point, that Zenith does not have means for maintaining a definite subatmosphere in the auxiliary reservoir, is well taken as far as the Zenith atmospheric well goes, but not as respects the starting tube, where Zenith does maintain, and always did have, a definite vacuum.

It may be further noticed that all of Anderson's jets are suction-controlled, while one of defendant's is gravity-controlled; also that

defendant's starting tube has no connection with the air intake, except at the very top under the throttle, while Anderson has two inlets into it from such intake.

With these differences in the means, operation, and result, particularly in operation and construction, infringement is so doubtful that it should not be decreed.

The question remains whether the feature of the Zenith starting tube infringes on Ahara or Richard, all the nozzles of which are suction-controlled. In my view the starting function is in one respect nearer to Ahara than any other part of the Zenith device. Ahara was principally designed to store fuel for a starting operation after an idle or nonshot period. So the Zenith starting well stores fuel after a period of rest, and gives a richer mixture on starting. Other analogies are not so close. It is not properly a U-tube with one end open to the atmosphere, because its lower end takes up the fuel, and opens into the main U-shaped tube or atmospheric well. Nor does it operate continuously, like Ahara, but only in starting, or for a short time thereafter. It seems, also, that special starting cups are used with the Ahara device on hit and miss engines.

If Zenith does not infringe any of complainant's patents in its main operation, as I think it does not, it should not be held to infringe on a minor operation not clearly disclosed by any of such patents. Infringement is at least doubtful, and should not be decreed.

As no infringement appears by the No. 2 carburetor, no injunction should issue, but there should be a decree to the effect that Ahara and Richard were infringed by the manufacture and sale of carburetors like Nos. 1 and 10, and for an accounting and damages, without costs to either party. The accounting should cover all forms like Nos. 1 and 10, or other forms having an eighth inch inlet, three or four sixteenths, or equivalents of either, or having a less area than one-eighth inch, or less than four sixteenths (equivalent to an eighth).

The motion made December 23, 1914, to vacate the injunction and discharge the bond, is granted.