## STEIN FUR DYEING CO., Inc., v. WINDSOR FUR DYEING CO., Inc.

District Court, E. D. New York.   March 4, 1929.

No. 3315.

Edward M. Evarts, of New York City (Richard B. Cavanagh, of New York City, of counsel), for plaintiff.

Everett & Rook, of Newark, N. J. (Russell M. Everett and Harry B. Rook, both of Newark, N. J., of counsel), for defendant.

CAMPBELL, District Judge.   This is an action in equity based on the alleged infringement of patent No. 1,564,378, issued to Hyman Stein, William E. Austin, and Irving Liebowitz, for "Improvement in Bleached and Dyed Furs and the Like," dated December 8, 1925; and patent No. 1,573,200, issued to Hyman Stein, William E. Austin, and Irving Liebowitz, for "Process for Bleaching and Dyeing Furs and the Like," dated February 16, 1926; both of which patents have been assigned to and are owned by the plaintiff.

Mr. William E. Austin, one of the inventors and secretary of the plaintiff, has had a wide experience in the fur dressing, dyeing, and bleaching arts, and is the author of "Principles and Practice of Fur Dressing and Fur Dyeing," published in 1922, by D. Van Nostrand Company, of New York, and I cannot better express the problem generally than in his words when on the stand:

"The dyeing of furs is probably one of the most difficult and most complicated applications of dyestuffs to any materials. Not only have you in a skin two entirely different consistencies of material, you have the leather and the hair part, which are entirely different in their nature, but even on the same skin, on the hair, there are great variations, the top hair, the upper part of the hair, has a different characteristic, and the under hair has a different characteristic. As far as the color of the hair is concerned, different parts

of the skin have different colors. On the back of the skin where the spine was there are usually darker parts, shading to lighter color until, on the under part, the belly, it is practically white. Furthermore, in order to preserve the characteristics of a fur such dyestuffs have to be used which can be applied at comparatively low temperatures, for elevated temperatures, such as are used on textile materials would be very injurious to the skin, and to the hair, too."

Originally the skins were used in their natural condition after a dressing operation, serving to make the hide soft and flexible and to give the hair as much luster as possible.

After that, wood dyes, the range of colors being very limited, were used to give the skins a particular color.

In 1888, a German chemist discovered that certain coal tar products, known as intermediates, which were practically colorless, could by the use of mordants be successfully used and made fast in the form of lakes, to develop colors on the fibers of hair and furs.

Light shades could undoubtedly be produced by this method on light or white furs, but what it is contended the process of the process patent in suit accomplishes is the applying of light shades on dark furs.

Bleaching in general was old, but the old methods resulted in weakening the texture of the leather portion and also in weakening the texture and destroying the luster of the hair portions.

The problem presented, which the patentees of the patent in suit contend they solved, therefore, was to bleach naturally dark skins without impairing the strength or texture of the hair, or in any way affecting the condition of the leather.

The defendants have interposed the defenses of invalidity and noninfringement.

The defense of invalidity alone requires consideration, because if valid all claims of both patents were infringed.

There are 24 claims in each of the patents in suit, and plaintiffs base this suit on all of the claims of each of the patents in suit.

The first (the product) patent in suit, No. 1,564,378, for improvement in bleached and dyed furs and the like, outlines the process described in the second (the process) patent in suit, No. 1,573,200, and then proceeds to describe the properties and superiorities of the resulting product, which are described and claimed in three stages: (1) The impregnation stage, with the acceleration and protective agent; (2) the bleached stage; and (3) in the bleached and subsequently dyed stage.

Claims 1 to 10, inclusive, and 21 and 22, cover the fur skin in its impregnated but unbleached condition. Claims 11 to 16, inclusive, cover the article in its bleached condition. Claims 17 to 20, inclusive, and 23 and 24, cover the article in its bleached and subsequently dyed condition.

The following claims may be taken as specimen claims of the said product patent, No. 1,564,378:

For the impregnation stage:

"1. As an article of manufacture, an unbleached fur skin or the like suitable for bleaching and being impregnated with a solution of a protecting agent to protect the skin against harmful oxidation during a subsequent bleaching operation."

"3. As an article of manufacture, an unbleached fur skin or the like suitable for bleaching and being impregnated with a solution of a ferrous salt."

For the bleaching stage:

"11. As an article of manufacture, a bleached fur skin or the like the fibres of which contain a protecting agent converted from a lower to a higher state of oxidation by the bleaching agent, said protecting agent having served to protect the skin from harmful oxidation under the action of said bleaching agent."

"14. As an article of manufacture, a bleached fur skin or the like the fibres of which contain a mineral protecting agent converted from a lower to a higher state of oxidation by hydrogen peroxide, said protecting agent having served to protect said skin from excessive oxidation under the action of the hydrogen peroxide."

For the bleaching and dyeing stages:

"18. As an article of manufacture, a bleached and dyed fur skin or the like having the fibres of the leather and hair making up the fur skin or the like substantially unimpaired as to strength, texture and lustre and containing an iron compound raised from a lower to a higher state of oxidation by the bleaching agent before the fur skin or the like has been dyed."

"20. As an article of manufacture, a bleached and dyed fur skin or the like having the fibres of the leather and hair making up the fur skin or the like substantially unimpaired as to strength, texture and lustre, and having the appearance, feel and texture of a fur skin or the like of the same species dyed to the same color from the natural white or other light colored fur skin or the like."

The second (the process) patent in suit, No. 1,573,200, for process of bleaching and dyeing furs and the like, contains a full

description of the invention sufficient to enable those skilled in the art to practice the invention, which is generally described in the specification as follows:

"While not limited thereto, our present invention finds particularly successful application in the bleaching or decolorizing, and subsequent dyeing, of dark colored fur skins which may, by means of the method of the present invention, be bleached or decolorized without impairing the strength or texture of either the leather or the hair of such fur skins, and which may thereafter be dyed the same colors as can at present be applied only to white or very light colored furs, which white or light colored furs are, as well known to those skilled in the art to which the present invention relates, comparatively expensive, the combined bleaching or decolorizing and subsequent dyeing operations requiring, under the conditions of the present invention, only as much time, in the average case, as the ordinary fur dyeing process alone."

It is further stated in the specification:

"It is, however, to be clearly understood that our invention is not limited to the specific embodiments thereof herein described for purposes of illustration only, and that the process may be applied with almost equal success to the bleaching or decolorizing and subsequent dyeing of other fibrous products, particularly of animal origin, than the fur skins here specifically described."

The specification describes a specific example as follows:

"The following is a specific example of one mode of applying the method of the present invention, it being understood, however, that the following description is given merely by way of illustration and that the process is not limited to the specific details of the following illustrative example.

"Brown moufflon are washed or 'killed' in an alkaline solution, for example, a solution of sodium carbonate. This washing operation ordinarily requires from about 2 to about 3 hours. The washed or 'killed' skins are then rinsed and thoroughly hydro-extracted. The skins are then immersed in a solution of the protective agent, such as in a solution of ferrous sulphate, and there allowed to remain over night. While the strength of the ferrous sulphate solution or its equivalent may vary within considerable limits, we prefer to use an aqueous solution of ferrous sulphate of a strength of from about 0.5 to about 5.0 per cent. of the solid crystallized ferrous sulphate, by weight.

"Such a solution may or may not contain the stabilizing agent. If a stabilizing agent,

such as ammonium chloride, is used, we prefer to use it in an amount approximately equal to the amount of ferrous sulphate used and equaling from about 0.5 to about 5.0 per cent. of ammonium chloride by weight.

"The fur skins or the like, after having been soaked for from about 8 to about 12 hours in the solution of the protective agent, with or without the addition of the stabilizing agent, are then rinsed and hydro-extracted. The treatment apparently impregnates or fills the voids and interstices of the fibres with the solution of protective agent. The fur skins thus treated are now immersed in a solution of hydrogen peroxide or equivalent bleaching agent. However, in place of hydrogen peroxide, we may use other bleaching agents, particularly sodium peroxide or sodium perborate, which yield hydrogen peroxide in solution in the presence of certain liberating agents, generally of an acid character. The amount of hydrogen peroxide used may vary from about five (5.0) to about one hundred (100.0) per cent. by volume of a three (3.0) per cent. solution of hydrogen peroxide. We prefer that the temperature at which the bleaching or decolorizing operation is carried out shall be between 60° and 100° F.

"The skins are subjected to the action of the bleaching or decolorizing agent until they have been sufficiently decolorized. The bleached or decolorized skins are then rinsed and can, if desired, be dyed directly in accordance with any of the well known or desirable processes employed for dyeing furs or the like. We may, however, subject the bleached or decolorized skins to the usual dyeing operations of washing and mordanting, and then dyeing the washed and mordanted skins in accordance with the practice hitherto generally employed for dyeing furs."

The process is described and claimed in three stages: (1) The preliminary treatment with the reducing compound, which is to serve as a protection and accelerating agent in the subsequent bleaching operation; (2) the bleaching operation in the presence of the accelerating and protective agent; and (3) the bleaching operation in the presence of the accelerating and protective agent, and the subsequent dyeing operation.

Claims 1 to 5, inclusive, cover the preliminary treatment, and the following claims may be taken as specimens:

"1. The method of bleaching fur skins and the like, which comprises treating the fibres with an oxidizing agent in the pres-

ence of a protecting agent comprising a reducing compound.

"2. The method of bleaching fur skins and the like, which comprises treating the same with an oxidizing agent in the presence of an accelerator comprising a mineral reducing compound."

Claims 6 to 14, inclusive, cover the bleaching operation, and the following claims may be taken as specimens:

"11. The method of bleaching fur skins and the like, which comprises treating the same with a solution of a protecting agent to which has been added ammonium chloride, and thereafter subjecting the articles so treated to the action of a solution of hydrogen peroxide."

"14. The method of bleaching fur skins and the like, which comprises treating the same with a solution of a protecting agent to which has been added ammonium chloride, and thereafter subjecting the articles so treated to the action of a bleaching agent."

Claims 15 to 24, inclusive, cover the bleaching and subsequent dyeing operations, and the following claims may be taken as specimens:

"18. The method of dyeing animal fibres, particularly fur skins and the like, which comprises bleaching the same with a solution of hydrogen peroxide in the presence of a fibre-protecting bleach accelerator comprising ferrous sulphate to which has been added ammonium chloride, and thereafter dyeing the product so bleached."

"20. The method of dyeing animal fibres, particularly fur skins and the like, which comprises bleaching such fibres in the presence of a fibre-protecting agent comprising a ferrous compound, and thereafter dyeing the bleached product."

The use of ferrous sulphate in fur dyeing was known long before it is even claimed that the invention of the patent in suit was made, as was also the use of hydrogen peroxide as a bleach. Fur Dressing and Fur Dyeing, by Austin, pp. 119 and 182.

All of the elements of the claims of the patents in suit were old, but still if a new result was accomplished, in a new and different way, by the use of old and well-known elements, the patent would be valid.

Defendant contends that by the action of the Patent Office in rejecting claims, and the patentees' acceptance of such rejection, the patentees were estopped to claim broadly; but this contention is not sustained because as broad or broader claims were allowed, which had never even been amended, and there was no estoppel as to such claims.

American Cone & Wafer Co. v. Denaro (C. C. A.) 297 F. 913; Kryptok Co. v. Stead Lens Co. (D. C.) 207 F. 85; Veneer Machinery Co. v. Grand Rapids Chair Co. (C. C. A.) 227 F. 419.

Of the many references set up in the answer, by way of anticipation, but eight were introduced in evidence by the defendant on the trial, viz., Defendant's Exhibits V, W, X, Y, Z, AA, BB, II.

Jahres Bericht der Chemischen Technologie, vol. 55 (2) year 1909, p. 489 (Defendant's Exhibit V), relates solely to the bleaching of wool, and contains no reference to the bleaching of furs.

The Journal of the Society of Chemical Industry, vol. XXVIII, 1909, p. 1083 (Defendant's Exhibit W), refers to the last-mentioned reference (Defendant's Exhibit V) and relates solely to the bleaching of wool and contains no reference to the bleaching of furs.

German patent No. 239,308, of October 12, 1911, issued to Wilhelm Buschhuter (Defendant's Exhibit X): This patent does not relate to bleaching of furs or any other fibers, but is a process for producing manganese bister on any desired organic fiber material that is for painting or pigmenting. The specific example referred to in the patent is on wool or silk, and I fail to see its relevancy.

The Journal of the Society of Chemical Industry, vol. XXX, 1911, p. 1377 (Defendant's Exhibit Y): This article in an English paper refers to the German patent No. 239,308, to Buschhuter (Defendant's Exhibit X), the lack of relevancy of which is emphasized by this article.

United States Patent No. 354,477, issued to John A. Just, and others, for process of bleaching vegetable fiber for the manufacture of paper, etc., dated December 14, 1886 (Defendant's Exhibit Z), relates to a process for bleaching vegetable fiber in the manufacture of paper, etc. It does not teach bleaching animal fibers, nor does it mention hair, leather, or fur, and is not an anticipation of any of the claims of either of the patents in suit.

French patent No. 470,940, issued to Andre Lafon, for process for decolorizing fur, issued June 29, 1914, published October 6, 1914 (Defendant's Exhibit AA): This is the only patent or publication cited by the defendant in its answer relating to the bleaching or decolorizing of fur; but defendant's own expert, Dr. Pond, testified with reference to this patent that he would not call this anticipation, certainly, and fur-

ther said that this patent uses copper sulphate, tartaric acid, and bichromate of potassium, and that the patent in suit uses ferrous sulphate, ammonium chloride, and hydrogen peroxide.

It seems to me to be the nearest reference cited, but I am convinced that it does not anticipate any claim of either of the patents in suit.

The Journal of the Society of Chemical Industry, vol. XVIII, 1899, at page 370 (Defendant's Exhibit BB): This article relates to improvements in the dyeing of hair and fur. Bleaching is nowhere referred to in this article, the process described being only a dyeing process, and so described by defendant's expert.

The Journal of the Society of Chemical Industry, vol. XXXII, 1913, p. 597 (Defendant's Exhibit II): The title of this article is "Furs; The dyeing of ———." Bleaching is not referred to in the article; only a dyeing process is described.

Defendant also offered in evidence textbook by William E. Austin, entitled "Principles and Practice of Fur Dressing and Fur Dyeing," published in 1922, by D. Van Nostrand Company, of New York (Defendant's Exhibit JJ).

This book exemplifies the prior state of the art and makes clear the problems which confronted the applicants for the patent in suit, but it does not indicate the nature, purpose, effectiveness, and value of the inventions claimed in the patents in suit, nor does it even indicate any of the basic principles underlying the same.

It is not an anticipation, nor do I believe it was urged as such.

Considering all of the references urged as anticipations to which I have referred, but one relates to the bleaching of furs, the French patent No. 470,940, to Andre Lafon, which is certainly the closest reference, and yet defendant's own expert said it was not an anticipation.

That some of the alleged anticipating patents may relate to decolorizing or bleaching or dyeing wool or fiber does not make them anticipations, because while the process of the process patent in suit might well be used to bleach or dye wool or fiber, yet the degree of heat that may be used in bleaching or dyeing wool or fiber may be such as to make it impracticable to use the process of any of the alleged anticipating patents for the bleaching or dyeing of furs, because of the peculiar characteristics of furs testified to by Mr. Austin and quoted early in this opinion, and surely a patent for the bleaching of vegetable fibers in the manufacture of paper did not anticipate any of the claims of the patents in suit.

Actual use of any of the processes of the alleged anticipating patents and publications was not shown.

None of the patents or publications cited anticipate.

Defendant alleges eleven different instances of prior knowledge and use and of prior public use and sale.

The number of instances alleged, however, does not add strength to this defense, because the instances may not be considered collectively, but each must be considered by itself, and proof beyond a reasonable doubt of one instance of prior knowledge and use, or of prior public use and sale, would be sufficient.

I will consider separately the alleged instances of prior knowledge and use, and of prior public use and sale.

Alleged prior use by Karl Haack and Haack & Co., including James R. Weldon, as alleged associate user:

These witnesses do not agree as to the time of the disclosure, nor do I believe they corroborate each other as to any of the processes described by Mr. Haack.

The only documentary evidence was a loose-leaf note book, written in German, which was supposed to contain the formulas.

In reading what Mr. Haack testified was a translation in English of the said formulas, he certainly did not adhere to the text, but substituted words for what was written; nor did he convince me that he had decolorized dark skins.

According to his own testimony, he never tried to furnish any of the so-called bleached skins to customers, and no customers were produced or named who had received any bleached skins, or bleached skins subsequently dyed.

In any event, neither of the processes described by him are like the process of the second patent in suit.

The testimony of the witness Weldon was such that no one knew exactly what the formula was that he claimed to have practiced, and he certainly did not corroborate the witness Haack.

The testimony of these two witnesses, and the evidence offered, does not convince me that they practiced any prior use that anticipated the patents in suit.

Alleged prior use by Abram Schiff and Paul Myer, of Schiff Bros.:

These witnesses do not corroborate each other as to dates or process.

No skins were produced, and no customers who obtained any such skins were either named or produced.

No documentary evidence of any kind was produced, and while the witness Schiff says he dropped the experiments about 1910, the witness Myer said they were continued up to the present time.

Certainly such evidence falls far short of that which is required to anticipate a patent.

Alleged prior use by Louis Estrin and Harry Estrin, of the Hudson Fur Dyeing Company:

The skins produced by the witness Louis Estrin were not shown to have been of a date early enough to show anticipation. No skins which they claim were bleached were ever delivered to customers.

The so-called light beaver skin was evidently a dark skin, dyed.

There is no documentary evidence produced with reference to this alleged use, the witnesses do not corroborate each other, and I am convinced that they did not practice the invention of the patents in suit before the application for the patent was filed.

Alleged prior use by Edward J. H. Gruenwald, of Alaska Chemical Company:

This was not included in the bill of particulars, and I might pass it by, but it is almost as easily disposed of, after consideration, because there is no corroboration of Mr. Gruenwald's testimony by any documents or physical exhibits; nor were any of the so-called bleached skins marketed as such, and there is no bleaching of a dark or other natural skin to a lighter color.

It does not anticipate.

Alleged prior use by Leo Simmons and Emil Lambourski, of Modern Fur Dyeing Company, Inc.:

The witness Simmons is not a dyer, but is interested in the Modern Fur Dyeing Company, Inc., which commenced the fur dyeing business in 1923, and did not practice the process, in quantity, until the spring of 1928.

No quantities or proportions were given by the witness, nor was there any corroboration by any documentary evidence or physical exhibits, and the witness says no bleaching was done between 1924 and 1927.

The testimony of the witness Lambourski needs no extended consideration. Such skins as he claims to have bleached he threw away, and abandoned the process he was practicing. No records, physical exhibits, invoices, or customers are produced as to either Simmons or Lambourski, and such evidence is not sufficient to show anticipation.

Alleged prior use by Herman A. W. Bindsell, of H. F. Bindsell & Son:

Taken in the sense most favorable to defendant, the witness only testified that some time between 1904 and 1910, by the use of hydrogen peroxide, or with albone and ammonia, he removed some of the vegetable dye and thus lightened the color of skins which had been dyed too dark, and then redyed them. None of the skins were sold after the color had been lightened and before redyeing, and whatever was the process, it was abandoned in 1910. No documentary evidence and no physical exhibits were offered, nor was any customer produced who had received any such skins.

Such evidence falls far short of the evidence required to show anticipation.

Alleged prior use by Frank Wittlin and Jacob Meyerson, of J. Meyerson, Inc.:

This alleged prior use was not included in the bill of particulars, and from the testimony of the witness Wittlin, I am satisfied that he never practiced the process of the patent in suit, or saw the process practiced, until after a date too late to anticipate the patent in suit.

I do not consider his so-called process a bleaching process, because he did not remove all or part of the natural pigment of the skin.

No documentary evidence was introduced, and no customers were called. No physical exhibits relevant to his practice of the alleged process were offered. The natural and so-called "bleached" skins offered in evidence were of a date long subsequent to the date of the patent in suit, and in the so-called bleaching of such skins the process was different from that of the patent in suit, in that no ferrous sulphate or its equivalent was used.

The witness Wittlin did not join J. Meyerson, Inc., until January, 1925, and therefore the alleged use by J. Meyerson, Inc., was too late to anticipate the process patent in suit, even if the same process was practiced, which was not done, and this is corroborated by the anxiety shown by the witness Wittlin to learn the process used by the plaintiff.

No documentary evidence was offered and no physical exhibits were offered in evidence, as the physical exhibits hereinbefore referred to were too late.

Anticipation cannot be shown by such evidence.

Alleged prior use by William E. Popkin, of Meisel-Galand Company, Inc.:

This alleged prior use is not included in the bill of particulars.

The witness testifies to what he says a workman told him when showing him a skin in 1923, and even that does not show that a dark skin had been bleached.

No documentary evidence and no physical exhibits were offered, and even if the testimony was that the witness had himself done the so-called bleaching, it is not evidence on which anticipation should be found.

Alleged prior use by Philip A. Singer, of Philip A. Singer & Bro.:

This alleged prior use was not included in the bill of particulars.

No documentary evidence or physical exhibits were offered, and so far as I can understand, the process of the witness, which he was willing to divulge, was not a true bleaching process, but was in reality a dyeing process. But in any event, even if the uncorroborated evidence of the witness Singer were sufficient, there is too much uncertainty to support the defendant's contention that such proof is sufficient to show anticipation.

Alleged prior use by Joseph C. Santimaura, Vito George, and Thomas G. Greenley, of B. J. Goodman, Inc. (now owned by A. Hollander & Son):

The proof offered as to this alleged prior use differs materially in its character from that offered to prove the preceding alleged prior uses, and the mere fact that it differs in date from that set up in the bill of particulars does not stamp with suspicion the testimony of the witnesses.

The witness Greenley is a chemist, who received his degree of Bachelor of Science, in 1898, and was employed by B. J. Goodman Company, now merged with A. Hollander & Son, Inc., fur dyers, as a chemist, from 1919 to 1926, during which time he, as one of his duties, was engaged in an effort to produce new effects or colors on skins.

That he made the experiments in evidence, Exhibits T 1, 2, 3, 4, 5, 6, is clearly shown by the book he produced, containing experiments Nos. 1224–1580, and which is in his own handwriting. T 1 and T 2 had no dates affixed, but they antedated T 3, which was dated April 17, 1924. T 4 and T 5 are undated, but they antedated T 6, which is dated May 22, 1924.

These experiments were carried on to produce new light colors.

The process as shown by the exhibits in question consisted in mordanting or soaking the skins overnight in one liter solution of ferrous sulphate (copperas), salammoniac (ammonium chloride), and tartar emetic; then squeezing or wringing the skins, and then immersing them for two hours in a solution of $H_2O_2$ (hydrogen peroxide), $H_2O$ (water), and $NH_4OH$ (ammoniated water).

In experiment T 1, witness Greenley said that he started with red squirrel skins, and at the end of the bleaching operation they had a dirty tan color. They were then dyed.

The witness George was manager fur dyer for the company and a practical fur dyer. He had access to the witness Greenley's experiment book and consulted with him during the experiments.

Witness George testified that these processes Exhibit T 1 to T 6, inclusive, had been put into commercial use under his direction with only a modification in the dyeing steps, and produced a page of a formula book, Exhibit U, which he read and explained, and which shows that on April 3, 1924, a lot of 1,000 squirrel skins were treated by that process.

Witness George said that the same process had been in commercial use since that time and is used to-day, and for that reason, when first examined, objected to putting the page in evidence.

Witness Santimaura, who testified that he was employed by the company as a dyer, and had been such for 14 years, said that Exhibit U was in his handwriting, and that the process had been carried out commercially about April 3, 1924, and was being used at the present time.

The question raised by the plaintiff, that the formula Exhibit U reads 3,000 pails of $NH_4OH$, instead of 3,000 CC (cubic centimeters) as read by the witness George, seems to me to be of no moment. The formula was correctly read by the witness George, and the process described is substantially similar to that described in the patent, and would give substantially the same result.

The date of Exhibit U is April 3, 1924, of Exhibit T 3, April 17, 1924, and as Exhibits T 1 and T 2 antedated Exhibit T 3, it would make their dates about that of Exhibit U, and as the date of Exhibit U was that of commercial use, it undoubtedly closely followed the experiment, T 1.

This evidence establishes this use as of April 3, 1924, beyond a reasonable doubt, which was before the date of the filing of the application for the patent in suit.

This leaves for consideration the sole remaining alleged prior use by Louis J. Hollander, of A. Hollander & Son, Inc.:

The witness Hollander testified that he has been engaged in the fur dyeing industry for more than 10 years, and is a fur dyer

supervisor of the plant of A. Hollander & Son, Inc., at Newark, N. J., and around 1918–1920 he personally experimented in making naturally dark colored fur skins lighter or beige color, and produced a formula book kept by him, which was examined by plaintiff's counsel and expert, and certain pages thereof were received in evidence as Exhibits A to F, inclusive.

The date of Exhibit E is November 1, 1920.

The process is described substantially as follows: The first step consisted in washing the skins in soda and salammoniac; the second step, termed by him the second wash, in putting the skins into a mordant, consisting of a solution of copperas or ferrous sulphate, salammoniac or ammonium chloride, and tartar emetic; the third step, the skins were bleached in peroxide until a beige color resulted; the fourth step, the skins were dyed into a beaver shade.

The skins on which this process was carried out at that time, the witness says, were 20 Australian rabbit skins, naturally a dark gray color.

Exhibit F is dated July 7, 1920, and Exhibit D is dated May 5, 1920.

The processes of Exhibits D and E are substantially similar, but there is a notation of "N. G." on Exhibit D, which means that the color was not suitable.

The processes of Exhibits E and F are substantially similar.

The process of Exhibit A, dated May 3, 1920, is similar.

The processes Exhibits B and C are dyeing processes, used to dye skins bleached by the process Exhibit A.

These processes are entered in the formula book partly in code, but the witness was familiar with the code.

That the book containing the originals of Exhibits A to F, inclusive, may not have been kept in the manner that chemists would have kept it, may well be true; but the witness Hollander was not a chemist, but simply a layman, a practical fur dyer, and if it recorded faithfully what he did, in a way that could be understood by one learned in the art, that is all that is required.

The witness Sabatino did not corroborate the witness Hollander as to the process, because he did not know the chemicals used, but did corroborate him only as to the physical steps which he performed under the witness Hollander's direction.

The witness Hollander testified that the process Exhibits A, D, E, and F have been used commercially on huge quantities of skins since 1920 to date, and that these processes have been used on all kinds of skins, some being marketed with the beige or yellow color produced by the bleaching operation, others being dyed other colors after the bleaching operations, and the processes were also used on previously dyed furs by bleaching and re-dyeing them.

No physical exhibits were produced, nor customers called as witnesses, nor was any documentary evidence in the form of books of account, invoices, bills, or of any other kind except the formulas aforesaid, produced, although ample opportunity was afforded to call such witnesses and produce documentary evidence.

The plaintiff contends that all the witness Hollander shows is that he made experiments, and that he does not show beyond a reasonable doubt that the processes in question were practiced on dark furs and not on white furs, and this contention is sustained.

The advertising by A. Hollander & Son, Inc., does not corroborate the testimony of the witness A. Hollander as to the date of his discovery, because we must assume that it at least was intended to state the facts, and if that be so, then the production of the beige furs was an accomplishment of very recent date before that of the advertisement.

There is no doubt that the custom of the fur trade was to keep the formulas of the various fur dyers as secret as possible, and in the case of the experiments by the witness Hollander it appears to have been absolute, as no witness was produced who had been taken into the confidence of the witness Hollander as to the formulas in question, and if such a witness existed, ample opportunity was afforded for his production.

B. J. Goodman Company had not been acquired by A. Hollander & Son, Inc., at the time of the filing of the application for the patent in suit, to wit May 3, 1924, because while the date of acquisition is not specifically shown, it appears by the testimony of the witness Santimaura to have been in 1926.

Prior use must be shown beyond a reasonable doubt to constitute anticipation, and without in any way intending to cast any doubt upon the intention of the witness Hollander to tell the truth as he believes it to be, I must and do hold that prior use by him has not been sustained by evidence eliminating all reasonable doubt. The Barbed Wire Patent, 143 U. S. 275, 12 S. Ct. 443, 36 L. Ed. 154; Deering v. Winona Harvester Works, 155 U. S. 286, 300, 15 S. Ct. 118, 39 L. Ed. 153; Clark Thread Co. v. Willimantic Linen

Co., 140 U. S. 481, 489, 11 S. Ct. 846, 35 L. Ed. 521.

The case of Corona Co. v. Dovan Corp., 276 U. S. 358, 48 S. Ct. 380, 72 L. Ed. 610, is not in point, as there were no surrounding circumstances shown here as there were in that case.

In order to carry back the date of invention and reduction to practice to the last part of December, 1923, or the early part of January, 1924, plaintiff is also required to prove such earlier date of invention and reduction to practice beyond a reasonable doubt. Dey. Time-Register Co. v. W. H. Bundy Recording Co. (C. C. A.) 178 F. 812; Goodyear Tire & Rubber Co. v. Hood Rubber Co. (D. C.) 224 F. 978, aff'd (C. C. A.) 225 F. 1021.

This plaintiff has accomplished, and has established as the earliest date of invention and reduction to practice December 28, 1923, both by oral and documentary evidence, because while the salesmen and customers were not able to testify to the exact process used, they testified to the delivery of dark skins to the plaintiff, and that beige (light) colored skins were returned, and Mr. Austin testified that the result was accomplished by the process of the process patent in suit.

The use by Joseph C. Santimaura, Vito George, and Thomas G. Greenley was established as of April 3, 1924, but too late to anticipate, as it was some three months subsequent to the date of invention and reduction to practice of the patents in suit, to wit, December 28, 1923, established by plaintiff on the trial.

■ Defendant's contention that one of the patents in suit, not stating which one, is invalid because both cover the same invention, is without merit. Providence Rubber Co. v. Goodyear, 9 Wall. (76 U. S.) 788, 19 L. Ed. 566; Giant Powder Co. v. Powder Works, 98 U. S. 126, 25 L. Ed. 77; Century Electric Co. v. Westinghouse E. & Mfg. Co. (C. C. A.) 191 F. 350; Theroz Co. v. United States Industrial Chemical Co. (D. C.) 14 F.(2d) 629; Dunn Wire-Cut Lug Brick Co. v. Toronto Fire Clay Co. (C. C. A.) 259 F. 258.

The cases cited by the defendant have been examined, but are not in point.

The commercial success of the patents in suit was amply established.

The patents in suit are valid as to all of their claims.

On the stipulation of the defendant, it is apparent that the defendant infringed all claims of both patents in suit because, construing such stipulation most liberally for defendant, it appears that it treated the skins in accordance with the process of the addendum, knowing that they were to be subsequently dyed; and therefore, as to claims 17 to 20, both inclusive, and claims 23 and 24 of the product patent, No. 1,564,378, and claims 15 to 24, both inclusive, of the process patent, No. 1,573,200, was at least a contributory infringer.

A decree may be entered in favor of the plaintiff against the defendant for an injunction, accounting for damages and profits, with costs and the usual order of reference.