STEINFUR PATENTS CORPORATION v. J. MEYERSON, Inc., et al.

SAME v. ICELAND FUR DYEING CO. et al.

SAME v. WILLIAM BEYER, Inc., et al.

SAME v. KARTEN et al.

Nos. 4940, 4939, 4989, 4988.

District Court, E. D. New York.

Sept. 9, 1931.

374

See, also (D. C.) 41 F.(2d) 948.

Edward M. Evarts, Christopher C. Cousins, and Morris H. Wolsky, all of New York City, for plaintiff.

Alexander A. Mayper and Frederick Breitenfeld, both of New York City, for defendants.

CAMPBELL, District Judge.

The four above actions were tried separately, but for convenience they were briefed together.

The issues involved therein are largely the same, differing of course in each action as to the alleged infringement and in some other particulars that will be noted.

Each action is brought by the plaintiff in equity for relief by injunction and damages for the alleged infringement of patent No. 1,564,378, issued by the United States Patent Office to Hyman Stein, William E. Austin, and Irving Liebowitz, assignors to Stein Fur Dyeing Company, Inc., for improvement in bleached and dyed furs and the like, and dated December 8, 1925, and patent No. 1,573,200, issued by the United States Patent Office to Hyman Stein, William E. Austin, and Irving Liebowitz, assignors to Stein Fur Dyeing Company, Inc., for improvement in bleaching and dyeing furs and the like, and dated February 16, 1926.

The applications for both patents were filed on May 3, 1924.

On the 2d day of January, 1929, both patents were duly assigned by Stein Fur Dyeing Company, Inc., to Fur Patents Corporation, which last-named corporation, on March 21, 1929, duly changed its name to Steinfur Patents Corporation, the plaintiff in this action, by a certificate filed in the office of the secretary of state of the state of New York, and its title to the patents in suit is unquestioned.

These suits are each based on all the claims of each of the said patents in suit.

The defendants in each case interposed answers raising the defenses of invalidity by reason of inoperativeness and anticipation by prior publications and noninfringement,

and in the two last above-entitled actions, to wit, against William Beyer, Inc., et al., and against Samuel A. Karten et al., respectively, the defendants interposed answers raising the issue of invalidity of the patents by anticipation by prior use.

In the first and second above-entitled actions against J. Meyerson, Inc., et al. and against Iceland Fur Dyeing Company et al., respectively, the defendants attempted to plead anticipations by prior use, but failed to make such plea of anticipation in accordance with the requirements of section 4920 of the Revised Statutes (35 USCA § 69), and the evidence offered in those actions to sustain the plea of anticipation was refused by the court, and therefore in those cases there is no question of anticipation by prior use to be considered.

Both patents in suit have previously been involved in litigation in this district, in a case entitled Stein Fur Dyeing Co., Inc., v. Windsor Fur Dyeing Co., Inc. (Equity No. 3315), in which after trial I held both patents in suit to be valid and infringed. 31 F.(2d) 128.

No appeal was taken from the decree entered in that suit.

Both patents in suit were also involved in litigation in this district in two other cases, namely, Steinfur Patents Corporation v. Meisel-Galland Co., Inc., et al. (Equity No. 4941),[1] and Steinfur Patents Corporation v. Sealect Fur Dyeing Co., Inc., Aaron Gellen and Philip Gellen (Equity No. 4938),[1] in which inquests were taken before this court, Judge Byers presiding, and interlocutory decrees entered on the 22d day of October, 1930.

In the case against Meisel-Galland Company, Inc., et al., the plaintiff having waived an accounting, a final decree was entered on the 9th day of December, 1930.

All of the defendants in each of the above-entitled actions, as well as the defendants in the aforesaid cases, against Meisel-Galland Company, Inc., et al., and against Sealect Fur Dyeing Company, Inc., et al., have been members of the Fur Dyers' Alliance, a membership corporation which was organized in June, 1930, to defeat the patents in suit, and have contributed to the defense of all of these actions, including the said actions against Meisel-Galland Company, Inc., et al., and against Sealect Fur Dyeing Company, Inc., et al.

Mr. Jacob Meyerson and Mr. Benjamin

Meyerson were individually defendants in the said action against Meisel-Galland Company, Inc., et al., and named in the decree, and by the injunction were individually enjoined from further infringement.

J. Meyerson, Inc., and William J. Beyer, Inc., were also members of the Fur Dressers' and Fur Dyers' Association, a membership corporation, which paid for the defense in the said case against Windsor Fur Dyeing Company, Inc.

The first (the product) patent in suit, No. 1,564,378, outlines the process described in the second patent in suit, No. 1,573,200, and is for an article of manufacture, a fur skin or the like, described in three stages, claims 1 to 10, inclusive, and 21 and 22 cover the first, the impregnation stage, with the acceleration and protective agent; claims 11 to 16, inclusive, cover the article in the second, the bleached stage, and claims 17 to 20, inclusive, and 23 and 24, cover the article in the bleached and dyed stage.

The second (the process) patent in suit, No. 1,573,200, is for bleaching and dyeing furs and the like, and is described in three stages. Claims 1 to 5, inclusive, cover the first, the preliminary treatment with the reducing compound which is to serve as a protective and accelerating agent in the subsequent bleaching operation. Claims 6 to 14, inclusive, cover the second, the bleaching operation, and claims 15 to 24, inclusive, cover the third, the bleaching and subsequent dyeing operation.

Generally, the process described consists in first subjecting the fur skins, or the like, to a washing or killing operation, and then treating them by immersion with a solution of a protecting and bleach accelerating agent, such as ferrous sulphate, to which may have been added ammonium chloride as a preservative agent. The skins are then rinsed, hydro-extracted, and then immersed in a bleaching solution such as hydrogen peroxide, and the skins rinsed and dried after the bleaching operation is completed.

The treatment of the skins with ferrous sulphate or its equivalent protects the skins from injury by the subsequent bleaching operation, and accelerates the bleaching operation.

The subjecting of naturally relatively dark skins to the bleaching operation by the use of hydrogen peroxide, or its equivalent, results in their attaining a relatively light color, capable of being successfully dyed any color the manufacturer may desire.

It is generally described in the specifica-

---

[1] No opinion filed in either case.

tion of the process patent, No. 1,573,200, as follows: "While not limited thereto, our present invention finds particularly successful application in the bleaching or decolorizing, and subsequent dyeing, of dark colored fur skins which may, by means of the method of the present invention, be bleached or decolorized without impairing the strength or texture of either the leather or the hair of such fur skins, and which may thereafter be dyed the same colors as can at present be applied only to white or very light colored furs, which white or light colored furs are, as well known to those skilled in the art to which the present invention relates, comparatively expensive, the combined bleaching or decolorizing and subsequent dyeing operations requiring, under the conditions of the present invention, only as much time, in the average case, as the ordinary fur dyeing process alone."

The specification further states: "It is, however, to be clearly understood that our invention is not limited to the specific embodiments thereof herein described for purposes of illustration only, and that the process may be applied with almost equal success to the bleaching or decolorizing and subsequent dyeing of other fibrous products, particularly of animal origin, than the fur skins here specifically described."

The specification also says:

"The following is a specific example of one mode of applying the method of the present invention, it being understood, however, that the following description is given merely by way of illustration and that the process is not limited to the specific details of the following illustrative example:

"Brown moufflons are washed or 'killed' in an alkaline solution, for example, a solution of sodium carbonate. This washing operation ordinarily requires from about 2 to about 3 hours. The washed or 'killed' skins are then rinsed and thoroughly hydro-extracted. The skins are then immersed in a solution of the protective agent, such as in a solution of ferrous sulphate, and there allowed to remain over night. While the strength of the ferrous sulphate solution or its equivalent may vary within considerable limits, we prefer to use an aqueous solution of ferrous sulphate of a strength of from about 0.5 to about 5.0 per cent. of the solid crystallized ferrous sulphate, by weight. Such a solution may or may not contain the stabilizing agent. If a stabilizing agent, such as ammonium chloride, is used, we prefer to use it in an amount approximately equal to the amount of ferrous sulphate used and equalling from about 0.5 to about 5.0 per cent. of ammonium chloride, by weight.

"The fur skins or the like, after having been soaked for from about 8 to about 12 hours in the solution of the protective agent, with or without the addition of the stabilizing agent, are then rinsed and hydro-extracted. The treatment apparently impregnates or fills the voids and interstices of the fibres with the solution of protective agent. The fur skins thus treated are now immersed in a solution of hydrogen peroxide or equivalent bleaching agent. However, in place of hydrogen peroxide, we may use other bleaching agents, particularly sodium peroxide or sodium perborate, which yield hydrogen peroxide in solution in the presence of certain liberating agents, generally of an acid character. The amount of hydrogen peroxide used may vary from about five (5.0) to about one hundred (100.0) per cent. by volume of a three (3.0) per cent. solution of hydrogen peroxide. We prefer that the temperature at which the bleaching or decolorizing operation is carried out shall be between 60° and 100° F.

"The skins are subjected to the action of the bleaching or decolorizing agent until they have been sufficiently decolorized. The bleached or decolorized skins are then rinsed and can, if desired, be dyed directly in accordance with any of the well known or desirable processes employed for dyeing furs or the like. We may, however, subject the bleached or decolorized skins to the usual dyeing operations of washing and mordanting, and then dyeing the washed and mordanted skins in accordance with the practice hitherto generally employed for dyeing furs."

The following claims may be taken as specimen claims of the product patent in suit, No. 1,564,378:

For the impregnation stage:

"1. As an article of manufacture, an unbleached fur skin or the like suitable for bleaching and being impregnated with a solution of a protecting agent to protect the skin against harmful oxidation during a subsequent bleaching operation."

"3. As an article of manufacture, an unbleached fur skin or the like suitable for bleaching and being impregnated with a solution of a ferrous salt."

For the bleaching stage:

"11. As an article of manufacture, a bleached fur skin or the like the fibres of

which contain a protecting agent converted from a lower to a higher state of oxidation by the bleaching agent, said protecting agent having served to protect the skin from harmful oxidation under the action of said bleaching agent."

"14. As an article of manufacture, a bleached fur skin or the like the fibres of which contain a mineral protecting agent converted from a lower to a higher state of oxidation by hydrogen peroxide, said protecting agent having served to protect said skin from excessive oxidation under the action of the hydrogen peroxide."

For the bleaching and dyeing stages:

"18. As an article of manufacture, a bleached and dyed fur skin or the like having the fibres of the leather and hair making up the fur skin or the like substantially unimpaired as to strength, texture and lustre and containing an iron compound raised from a lower to a higher state of oxidation by the bleaching agent before the fur skin or the like has been dyed."

"20. As an article of manufacture, a bleached and dyed fur skin or the like having the fibres of the leather and hair making up the fur skin or the like substantially unimpaired as to strength, texture and lustre, and having the appearance, feel and texture of a fur skin or the like of the same species dyed to the same color from the natural white or other light colored fur skin or the like."

The following claims may be taken as specimen claims of the process patent in suit, No. 1,573,200:

For preliminary treatment:

"1. The method of bleaching fur skins and the like, which comprises treating the fibres with an oxidizing agent in the presence of a protecting agent comprising a reducing compound.

"2. The method of bleaching fur skins and the like, which comprises treating the same with an oxidizing agent in the presence of an accelerator comprising a mineral reducing compound."

For the bleaching operation:

"11. The method of bleaching fur skins and the like, which comprises treating the same with a solution of a protecting agent to which has been added ammonium chloride, and thereafter subjecting the articles so treated to the action of a solution of hydrogen peroxide."

"14. The method of bleaching fur skins and the like, which comprises treating the same with a solution of a protecting agent to which has been added ammonium chloride, and thereafter subjecting the articles so treated to the action of a bleaching agent."

For the bleaching and dyeing operation:

"18. The method of dyeing animal fibres, particularly fur skins and the like, which comprises bleaching the same with a solution of hydrogen peroxide in the presence of a fibre-protecting bleach accelerator comprising ferrous sulphate to which has been added ammonium chloride, and thereafter dyeing the product so bleached." '

"20. The method of dyeing animal fibres, particularly fur skins and the like, which comprises bleaching such fibres in the presence of a fibre-protecting agent comprising a ferrous compound, and thereafter dyeing the bleached product."

The principal attack upon the validity of the patents in suit is based upon their alleged inoperativeness. In other words, the defendants contend that if the teaching of the patents in suit be followed, skins will not be successfully bleached. The defendants urge:

1. That each of the patents in suit is wholly invalid for all or any of the following reasons:

(a) Because the process disclosed by them does not accomplish what it is stated to accomplish.

(b) Because the process is insufficiently, improperly, and misleadingly described.

(c) Because it fails to teach the industry or the public anything new or useful.

(d) Because the patents were fraudulently obtained by presenting to the Patent Office a false and deceptive picture of the state of the art, and of the alleged merits of the process involved.

2. That the process patent issued over two months after the product patent is wholly invalid because of double patenting.

3. That claims 17 and 20 of the product patent are wholly invalid, because they are far broader than the disclosure, and monopolize all unimpaired bleached or dyed fur skins, regardless of how they are produced.

4. That claims 1, 6, 7, 11, and 15 to 24 of the process patent, and claims 1, 6, 11, 16, and 21 to 24 of the product patent, are wholly invalid, because the terms used therein, namely, "protecting agent," "metallic protecting compound," "mineral protecting agent," "fibre protecting agent," and "fibre protecting bleach accelerator," are utterly meaningless, unsupported by the disclosure,

and wholly inconsistent not only with chemical theory but with actual facts.

5. That claims 1–3, 6–9, 13, 17, 19, and 22 of the process patent, and claims 2, 4, 7, 9, and 22 of the product patent, are wholly invalid, because the terms used therein, namely, "reducing compound," "reducing substance," "mineral reducing compound," and "stabilizing agent," are ambiguous, indefinable, meaningless, and broader than the disclosure.

6. That the claims 1, 6, 11–16, 21–24, of the product patent, are invalid, because the terms "harmful oxidation," "excessive oxidation," and "harmful chemical action," impart a significance to these claims which is unwarranted by the chemistry involved, and which is predicated solely upon the false statements contained in the specification for the purpose of deceiving the Patent Office.

7. That claims 4, 5, 9, 10, 12, 15, 17, 20 and 23 of the process patent, and claims 3, 5, 8, 10, 13, 15, 18, and 19 of the product patent, are invalid, because the single disclosure in the specification of the use of ferrous sulphate does not justify the use in these claims of the term "ferrous compound," "ferrous salt," or "iron compound," especially in view of the fact that almost all other ferrous salts or iron compounds cannot be used as an equivalent or substitute.

8. That claims 4, 5, 9, 10, 12, 15–18, 20, 21, 23, and 24 of the process patent, and claims 3, 5, 8, 10, 13, 15, and 17–20 of the product patent, are invalid, because the processes and the products respectively set forth therein are wholly lacking in any or that degree of invention which is necessary to support patentability.

To support their contention defendants relied principally upon the testimony of their expert, who testified that theoretically the patents could not work and that from certain ex parte tests carried on by him it was demonstrated that the patents would not work.

Without intending in any way to disparage the ability of the defendants' expert as a chemist, it is fair to say that he had no prior experience in the art of fur bleaching and dyeing, except some experience on human hair.

The great difference in the skins of different kinds of animals and even in animals of the same kind and comparatively wide range in quantities of chemicals and in time required for operations as disclosed in the patents in suit convinces me that practical experience plays a large part in fur bleaching and dyeing, and it was to those skilled in the art by experience as well as theory that the teachings of the patent were directed.

To those skilled in the art as I have defined them the process is sufficiently and properly described, and there is nothing in the description which would mislead any one skilled in the art. The proof of this is found in the testimony of those engaged in skin bleaching and dyeing, who have practiced the process of the patent in suit, which is to me much more satisfactory evidence than the theoretical testimony of chemists.

The defendants also offered evidence to the effect that the Stein Fur Dyeing Company, Inc., the plaintiff's predecessor in title, had poor success and spoiled skins in the use of the process, for which spoiled skins that company paid damages.

That the Stein Fur Dyeing Company, Inc., spoiled some skins and paid damages cannot be denied, and this is true of all bleachers and dyers of skins, but nothing speaks louder in praise of the patents in suit than the testimony of Mr. Austin, supplemented by the records of the Stein Fur Dyeing Company, Inc., that during the year 1926, 67,654 skins were successfully treated by the process of the patents in suit, the service charge therefor amounting to $24,044.14, less the allowance for damaged skins of $1,354.68; for the year 1927, 137,865 skins with service charges totaling $60,005, less the allowance for damaged skins of $4,193.67; and for the year 1928, 145,807 skins, with service charges of $36,854, less the allowances for damaged skins of $5,511.

As against the testimony of defendants' expert who was inexperienced in the art of fur bleaching and dyeing, we have the testimony of the plaintiff's expert, a man with over six years' experience in fur bleaching and dyeing, and the head of the research department of A. Hollander & Son, Inc., the largest fur dyers in the world, who says from practical experience that the patents are operative, and that by following their teachings entirely satisfactory results are achieved.

In addition to this, it was shown that an action was brought against Philip A. Singer & Bro. under the patents; that the action was settled and the defendant became a licensee of the plaintiff and paid $4,000 on account of royalties; that Stein & Sons Fur Dyers, Inc., are licensees under the patents in suit, and have paid $3,000 on account of royalties; that A. Hollander & Son,

Inc., are licensees under the patents in suit, having treated about 590,000 skins, and having paid royalties of $10,168.02; that the Mendoza Fur Dressing Works, Inc., is a licensee under the patents in suit, and has paid royalties of $10,700; and that Harris & Reichard Fur Dyers, Inc., became a licensee under the patents in suit, after an action against them had been commenced, and have paid royalties in excess of $6,000.

It also appears that Solomon Stein, in the course of his business in connection with Stein & Sons Fur Dyers, Inc., successfully bleached a batch of 800 rabbit skins, using the identical process of the patent in suit; and that Mr. Becher, while associated with the Federal Fur Dyeing Company, bleached and dyed, by the exact process of the patents in suit, as far back as 1928, fur skins in evidence which bear the original labels used on the trial of the Windsor Case, and are in excellent condition.

During the trial of the first above-entitled case, Solomon Stein conducted a test, in the rear of the courtroom, at which the defendants were invited to be present, in which the exact process of the patent in suit was used on moufflons, which were offered in evidence and appear to be in perfect condition.

■ The burden of proof that the patent is inoperative rests very heavily on the defendants urging it. Radio Corporation of America v. E. J. Edmond & Co. (D. C.) 20 F. (2d) 929, 930; Remington Cash Register Co. v. National Cash Register Co. (D. C.) 6 F.(2d) 585, 618.

■ The evidence of ex parte tests to prove inoperativeness is usually disregarded by the courts. Bethlehem Steel Co. v. Niles-Bement-Pond Co. (C. C.) 166 F. 880, 888, affirmed on opinion below (C. C. A.) 173 F. 1019; Permutit Co. v. Harvey Laundry Co. (D. C.) 274 F. 937, affirmed (C. C. A.) 279 F. 713, certiorari denied 259 U. S. 588, 42 S. Ct. 590, 66 L. Ed. 1078; Chadeloid Chemical Co. v. Wilson Remover Co. (D. C.) 220 F. 681, 682, affirmed (C. C. A.) 224 F. 481; Medusa C. Waterproofing Co. v. Ceresite Waterproofing Co. (D. C.) 271 F. 122.

■ The defendants have admitted that the patent worked on a small scale, and that admission may be sufficient to uphold the patents. Electro-Dynamic Co. v. United States Light & H. Corp. (C. C. A.) 278 F. 80, 85.

■ The utility of the patents in suit may be attested by the litigation over them. Eames v. Andrews, 122 U. S. 40, 55, 7 S. Ct. 1073, 30 L. Ed. 1064.

■ Furthermore, if the fact of infringement be shown as against any defendants, it may be accepted as evidence of utility as against such defendants. Boyce v. Stewart-Warner Speedometer Corporation (C. C. A.) 220 F. 118; Seymour v. Ford Motor Co. (C. C. A.) 44 F.(2d) 306, 308.

■ The defendants have failed to bear the burden of proving inoperativeness of the patents in suit.

I cannot agree with the contention of the defendants that the patents fail to teach the industry or the public anything new and useful.

It is true that the use of ferrous sulphate in fur dyeing was known long before it is even claimed that the invention of the patent in suit was made, but only as a mordant, as was also the use of hydrogen peroxide as a bleach, but only light colored skins were bleached, and there was no teaching whatever in the prior art of the bleaching of dark colored skins, as this could not be accomplished by brushing, and if it was attempted by immersion, the strength of the bleach would have been so great, and the time the skin would have had to remain immersed would have been so long, that both the hair and the leather would be impaired, and the product would be uncommercial.

■ All of the elements of the claims of the patents in suit were old, but still if a new result was accomplished in a new and different way, by the use of old and well-known elements, the patents would be valid.

■ No patents were set up in the answers of any of the defendants as anticipations, nor were any offered in evidence to show the prior state of the art.

Eleven publications were set up in the defendants' bills of particulars.

The John Caspe article, which was published in December, 1930, and Wilson's Chemistry, which was published in 1929, are obviously not anticipations, as they were published more than five years after the filing of the applications which resulted in the patents in suit.

Rogers' Practical Tanning, and the pamphlet of T. Pang Hou, were not introduced in evidence.

Mellor's Inorganic Chemistry shows that hydrogen peroxide has been used for bleaching silk, feathers, straw, hair, ivory, and teeth; but that does not anticipate as I have

found that the use of hydrogen peroxide for bleaching was old, and there is no suggestion in that publication of the combination of the patents in suit.

While not mentioned in the testimony, and therefore perhaps it is unnecessary to give it further consideration, The Afga Booklet, published in 1922, discloses only the ordinary old-fashioned bleaching without any ferrous sulphate, and does not anticipate.

The Dictionary of Chemical Solubilities shows solubility factors and is not an anticipation. Reference to it is made in cross-examination to show the insolubility of certain chemicals by water.

I am unable to find any anticipation in the quoted portion of Treadwell's Analytical Chemistry, which states that ferrous salts have been known to be oxidized by the air to ferric salts; and likewise in Smith's book on chemistry, in which he says that hydrogen peroxide has long been known to be a very active oxidizing agent.

None of the publications to which I have referred mention any process or product which, if given the most liberal interpretation, could be held to anticipate the patents in suit.

Austin's Fur Dressing and Fur Dyeing was written by William E. Austin, one of the patentees of the patents in suit, and clearly shows the prior state of the art in describing how dyeing was achieved by a brush dye with hydrogen peroxide, and in stating that if dipping was used, a less concentrated solution of peroxide was employed.

The testimony of defendants' expert is strongly corroborative of the plaintiff's contention that the patents disclose something new, as he said on the witness stand that he would be surprised if the patents worked, as he stated the teachings of the art were that in any bleaching, iron should be kept away.

It is clear to me that the teachings of the patents were not anticipated by any one of the publications in evidence. Eames v. Andrews, supra.

Prior knowledge and use by seven companies was set up in the amended answers and bills of particulars, but evidence of such knowledge and use was offered only as to three, viz., by Jacob Meyerson, Samuel A. Karten, of the Superior Fur Dyeing Company, and David Berkowitz, and these, if shown, can relate only to claims 17 and 20 of the product patent in suit, which read as follows:

"17. As an article of manufacture, a bleached and dyed fur skin or the like having the fibres of the leather and hair making up the fur skin or the like substantially unimpaired as to strength, texture and lustre."

"20. As an article of manufacture, a bleached and dyed fur skin or the like having the fibres of the leather and hair making up the fur skin or the like substantially unimpaired as to strength, texture and lustre, and having the appearance, feel and texture of a fur skin or the like of the same species dyed to the same color from the natural white or other light colored fur skin or the like."

As to all the other claims of the product patent there can be no anticipation, unless the process patent be anticipated.

The alleged prior use by Mr. Karten finds no support except his testimony that the practice took place in complete secrecy, and that the use was an abortive and unsuccessful one, which was completely abandoned.

No skins were produced which had been bleached by him, and his testimony that the skins had been bleached, and that the skins were in good condition, falls far short of the evidence requisite to prove prior use. The advertisements which his company carried in fur trade magazines, of skins of light color, likewise fall far short of the requisite corroboration, because nowhere in the advertisements does it appear what process was used, or what was the natural color of the skins, and as a matter of fact, any of the colors mentioned in the advertisements could be made on a naturally white skin. Furthermore, Mr. Karten contradicted himself on the very material matter of the use of ferrous sulphate, and although he testified it was his custom to keep records of his formulæ, the only one on letterhead was that containing the alleged prior use.

The alleged prior use by Mr. Meyerson is supported by no stronger testimony than that of Mr. Karten, even if it be as strong.

No skins were produced which had been bleached by him, and no records which show that skins had been bleached. The few receipts produced do not mention whether the skins had been bleached, and the advertisements in the magazines produced, while they indicate something about dyeing, do not indicate anything about bleaching.

The alleged prior use by Mr. Berkowitz is even weaker than the others. He produced no skins which had been bleached by him, and no written evidence of any kind, and

admitted that he was very interested in seeing these patents invalidated.

The alleged secret use by the Superior Company seems to me to be ineffective as an anticipation. Robinson on Patents, §§ 317, 320; Bullock Printing Press Co. v. Jones, 13 O. G. 124, Fed. Cas. No. 2,132; Smith v. Davidson, 19 C. S. 691; Carpenter v. Smith, 1 Web. 530; Carpenter v. Smith, 1 Web. 540; Diamond Patent Co. v. S. E. Carr Co. (C. C. A.) 217 F. 400; Acme Flexible Clasp Co. v. Cary Mfg. Co. (C. C.) 96 F. 344, affirmed (C. C. A.) 101 F. 269; Zinsser v. Kremer (C. C.) 39 F. 111; Mayer v. Mutschler (D. C.) 237 F. 654.

Not only was the alleged use secret, but Mr. Karten, according to his own testimony, abandoned the use of the process because it did not work, and abandoned experiments or unsuccessful ventures cannot anticipate a patent. Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821; Wayne v. Holmes, 2 Fish. Pat. Cas. 20, Fed. Cas. No. 17,303; Jones v. Pearce, 1 Web. 122; Permutit v. Harvey Laundry Co., supra.

The evidence falls short of that required to sustain anticipation. It is neither clear, satisfactory, nor does it prove anticipation beyond reasonable doubt. Barbed Wire Patent, 143 U. S. 275, 12 S. Ct. 443, 36 L. Ed. 154; Deering v. Winona Harvester Works, 155 U. S. 286, 15 S. Ct. 118, 39 L. Ed. 153; Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 11 S. Ct. 846, 35 L. Ed. 521; Young v. Wolfe (C. C.) 120 F. 956; Dreyfus v. Schneider (C. C.) 25 F. 481.

On all the evidence I am convinced that the patentee invented a new and useful product, and claimed the same in claims 17 and 20 of their product patent in suit, No. 1,564,378, and that the product so claimed was never known, used, or described prior to the invention of the patents in suit, but they did not claim, nor could they claim, a product known in the prior art.

Without regard to whether the alleged infringers follow out the process described by the patentees, so long as they do not strictly confine their product to one known in the prior art, the owner of the said product patent in suit is entitled to be protected in the use of such product. General Electric Co. v. Laco-Philips Co. (C. C. A.) 233 F. 96; Claude Neon Lights, Inc., v. American Neon Light Corporation (C. C. A.) 39 F. (2d) 548; Theroz Co. v. United States Industrial Chemical Co. (D. C.) 14 F. (2d)

629, affirmed (C. C. A.) 25 F. (2d) 387, certiorari denied 278 U. S. 608, 49 S. Ct. 12, 73 L. Ed. 534; Maurer v. Dickerson (C. C. A.) 113 F. 870, certiorari denied 186 U. S. 481, 22 S. Ct. 941, 46 L. Ed. 1266; Dunn Wire-Cut Lug Brick Co. v. Toronto Fire Clay Co. (C. C. A.) 259 F. 258.

This question was not specifically urged in the Windsor Case, and therefore I did not, at that time, specifically pass upon it, but I have no doubt, on the evidence offered in the instant suit, about the right of the owner of the product patent in suit, No. 1,564,378, to a monopoly upon it, regardless even of great variations in the method of making the product. Giant Powder Co. v. California Powder Works, 98 U. S. 126, 136, 137, 25 L. Ed. 77; Leeds & Catlin v. Victor Talking Mach. Co., 213 U. S. 301, 318, 29 S. Ct. 495, 53 L. Ed. 805; Maurer v. Dickerson, supra; Durand v. Schulze (C. C.) 61 F. 819, 821; Lamb Knit Goods Co. v. Lamb Glove & Mitten Co. (C. C. A.) 120 F. 267, 269; Sanitas Nut Food Co. v. Voight (C. C. A.) 139 F. 551, 552, 553; Acme Acetylene A. Co. v. Commercial Acetylene Co. (C. C. A.) 192 F. 321, 325, 326.

The contention of the defendants that the patents were fraudulently obtained, by presenting to the Patent Office a false and deceptive picture of the state of the art, and of the alleged merits of the process involved, is not sustained: First, because if there was fraud used in securing the patent, then the patent could be attacked on that ground only by the United States; and, second, because the evidence not only does not sustain the contention, but, on the contrary, the picture of the state of the art was not false and deceptive but true, and the process involved has merit, and by its use large quantities of dark skins have been successfully bleached and dyed a light color, with little or no impairment of their strength, texture, and lustre, which had not been accomplished before the invention of the patent in suit.

The defendants' contention that the process patent is wholly invalid because of double patenting is not sustained, as the method and the product are separable inventions, supporting separate patents. Providence Rubber Co. v. Goodyear, 76 U. S. (9 Wall.) 788, 19 L. Ed. 566; Powder Co. v. Powder Works, supra; Century Electric Co. v. Westinghouse E. & Mfg. Co. (C. C. A.) 191 F. 350; Theroz Co. v. United States Industrial Chemical Co., supra; Dunn Wire-Cut Lug Brick Co. v. Toronto Fire Clay Co., supra.

The terms "protecting agent," "metallic protecting compound," "mineral protecting agent," "fibre-protecting agent," and "fibre-protecting bleach accelerator," have a very definite meaning as used in the patents in suit.

A "protecting agent" is one which, in the course of an operation, would tend to prevent any damage that might otherwise occur during that operation.

A "mineral or metallic compound" is one in which there is no organic matter.

In the illustrative embodiment described in the patents in suit, "ferrous sulphate," or "ferrous ammonium sulphate," would be described by any of the terms hereinbefore recited, and would protect the hair and also the leather of the skin from damage during the bleaching operation.

If oxidation, bleaching of a rabbit or other skin of like character to a light color was attempted with an ordinary bleach, such as strong hydrogen peroxide without a protecting agent, it would be necessary to subject it to such a strenuous bleaching operation that by ordinary means of bleaching the hair would curl up, become harsh and tender, and the fiber of the hair would be damaged to a considerable extent during the course of the bleaching, and the solution would have to be made so alkaline that it would hydrolize the leather to a large extent and damage it, rendering the skin an uncommercial article.

The terms "reducing compound," "reducing substance," "mineral reducing compound," and "stabilizing agent," have a very definite meaning as used in the patents in suit.

A "reducing agent" is one that will lower the positive valence of an element or remove oxygen from a compound.

Ferrous sulphate and ferrous ammonium sulphate are reducing agents.

A stabilizing agent is one which when placed in a solution of ferrous sulphate would tend to make the ferrous sulphate go on the fiber in a uniform condition, and keep it from oxidizing too rapidly.

Ammonium chloride, tartar emetic, and a mixture of ammonium chloride and tartar emetic are stabilizing agents.

The terms "harmful oxidation," "excessive oxidation," and "harmful chemical action," as used in the product patent in suit, have a definite meaning and relate to what would occur if it was attempted to effect oxidation, bleaching of a dark skin with an ordinary bleach, such as strong hydrogen peroxide, without a protecting agent.

The use of the words "ferrous compound," "ferrous salt," or "iron compound" is justified because a "ferrous salt" is defined as a salt of iron with any acid in which the iron is in a diavalent condition.

Ferrous sulphate and ferrous ammonium sulphate are such salts, and almost any of the iron salts could be used, providing that they are fixed on the fiber properly. Ferrous pyrolignite or "iron liquor," as it is commonly called, could also be used, and so could ferrous sulphide if an iron sulphate was first put on the skin.

Probably collodial sulphide solution could be used, and even collodial hydroxide solution could be used, if the solution was made alkaline, keeping the gums in there to prevent a precipitation of the iron. Equivalent salts of nickel and nickelous condition and of cobalt and cobaltous condition could be employed, but they would only give a modified or slight bleaching action, but not as effective as iron.

The processes and the products, respectively, set forth in claims 4, 5, 9, 10, 12, 15–18, 20, 21, 23, and 24 of the process patent, and claims 3, 5, 8, 10, 13, 15, and 17–20 of the product patent, are supported by the invention of the patents in suit.

The invention of the process patent is the discovery of a method of bleaching or bleaching and dyeing naturally dark skins without impairing the strength or texture of the hair, or the condition of the leather, in a very much shorter time than was required by the methods of the prior art.

The time was of moment, because, the strength of the bleaching element required being great, the time the skin was required to be immersed, under the prior art, played a large part in impairing the strength or texture of the hair, and the condition of the leather.

Therefore, prior to the invention of the patents in suit, bleaching was confined to naturally light colored skins, and with not as satisfactory results.

The naturally light colored skins were more expensive, and therefore by the invention of the patents in suit, the cost of bleached and bleached and dyed skins to light colors was reduced.

The invention of the product patent is the bleached or bleached and dyed skin, the strength or texture of hair, and the condi-

tion of the leather of which have not been impaired.

Both in the process and product patent, the results are secured in the manner claimed in said enumerated claims; the terms "oxidizing agent," "accelerator," "ferrous compound," "stabilizing agent," "bleaching agent," and "fibre-protecting bleach" having been hereinbefore defined.

Defendants strenuously assail the validity of the patents, by words oral and written; but their actions speak louder than their words and show how highly they value the invention, and that should be persuasive with this court.

The patents in suit are valid and are entitled to a range of equivalents wide enough to protect the invention.

Plaintiff contends that the defendants, by reason of their membership in the Fur Dressers' and Fur Dyers' Association, or the Fur Dyers' Alliance, or both of such organizations, and contribution to the defense of former litigations, are estopped by the adjudication in Stein Fur Dyeing Co., Inc., v. Windsor Fur Dyeing Co., Inc. (Equity No. 3315), in this district, or in Steinfur Patents Corporation v. Meisel-Galland Co., Inc., et al. (Equity No. 4941) in this district, or in both of said actions, and cite: Reo Motor Car Co. v. Gear Grinding Mach. Co. (C. C. A.) 42 F.(2d) 965, 967; Lathrop v. Rice & Adams Corporation (C. C. A.) 21 F.(2d) 124, affirmed (C. C. A.) 24 F.(2d) 1021, affirmed 278 U. S. 509, 49 S. Ct. 220, 73 L. Ed. 480; Warford Corporation v. Bryan Screw Mach. Products Co. (C. C. A.) 44 F.(2d) 713, 715; Riehle v. Margolies, 279 U. S. 218, 225, 49 S. Ct. 310, 73 L. Ed. 669; Grubb v. Public Utilities Comm., 281 U. S. 470, 50 S. Ct. 374, 74 L. Ed. 972; Vapor Car Heating Co. v. Gold Car Heating & Lighting Co. (C. C. A.) 7 F.(2d) 284, 287, certiorari denied 268 U. S. 705, 45 S. Ct. 639, 69 L. Ed. 1167.

The Windsor Case was properly pleaded by plaintiff, and waiving any question as to whether by amendment plaintiff could plead a judgment subsequent to the date of the original complaint, or should have pleaded the later adjudication by a supplemental complaint, I have considered the plaintiff's plea of prior adjudication, in both cases, although I have found for plaintiff on the facts and consideration of such plea may not be necessary.

The difficulty I find with the plaintiff's contention is that in this case there was no evidence offered to show that at the time of the trials of the prior suits, plaintiff knew of the contribution of the defendants to the defense of the prior actions, and therefore if the decision had been adverse to the plaintiff, in either of those adjudications, any other member of the association, if sued by the plaintiff, could not have sustained the plea that plaintiff was estopped by the prior adjudication.

There being no reciprocal or mutual effect to those adjudications, the plaintiff has generally failed to sustain its contention. Lane v. Welds (C. C. A.) 99 F. 286, 288; Westinghouse E. & Mfg. Co. v. Jefferson E. L., H. & P. Co. (C. C.) 128 F. 751, 753; Cramer v. Singer Mfg. Co. (C. C. A.) 93 F. 636, 637; Hanks Dental Ass'n v. International Tooth Crown Co. (C. C. A.) 122 F. 74; Stromberg Motor Devices Co. v. Zenith Carburetor Co. (D. C.) 220 F. 154, 155.

Of course, as to any defendants in these actions who were defendants in the prior actions, the adjudication therein is res adjudicata.

This brings us to the question of infringement.

As to the charge of infringement in the first above-entitled suit against J. Meyerson, Inc., et al., of the claims of the product and process patents, I have no doubt both from the admissions contained in the interrogatories and the testimony given by Mr. Meyerson in open court on the trial, that the defendants infringe both of said patents in suit.

No attempt, even, was made by the defendants to follow the teachings of the prior art.

This is shown in the answers to the interrogatories, which state that the defendants, since February 16, 1926, and prior to the commencement of this action, treated fur skins or the like with a solution of ferrous compound and thereafter bleached the skins so treated, and is proof of infringement of both patents in suit.

The two hundred mole skins which Mr. Meyerson testified were bleached sometimes in the presence of ferrous sulphate with a hydrogen peroxide bath, and at other times in the presence of ferrous ammonium sulphate with a hydrogen peroxide bath, likewise constituted an infringement of the claims of both of the patents in suit, and in both processes and products are found all of the elements of both patents in suit.

With reference to the so-called bleaching without the presence of ferrous sulphate, as testified to by Mr. Meyerson and Mr. Wittlin, the chief dyer for Meyerson, it is to be noted that in the so-called dyeing step of the operation, 333 c. c. of 10 volume peroxide per gram of dye was used after there had been treatment with ferrous sulphate, and thus a bleach was effectuated after a treatment with ferrous sulphate, and this it seems to me is practicing the invention of the process patent.

The effect of the use of that quantity of peroxide would be a development of the color, and then destruction of the color by the excess amount of peroxide resulting in a bleaching of the natural color of the fiber, the hair, and skin, by the excess amount of peroxide used. In other words, it would be a bleaching in the presence of ferrous sulphate, and would infringe all of the claims of the process patent in suit, and the product would infringe all of the claims of the product patent in suit.

The so-called mordanting in this operation is not the old and well-known mordanting, the use of ferrous sulphate combining with a dyestuff to form an insoluble compound, which produces in the fiber a fixed color, but is a treatment with ferrous sulphate designed to play a part in bleaching the skins. In other words, bleaching the skins with a solution of hydrogen peroxide, in the presence of ferrous sulphate, as taught in the process patent in suit.

As to the charge of infringement in the second above-entitled suit against Iceland Fur Dyeing Company et al., it is clearly shown both as to the process and product patents in suit.

Here again we have no attempt, even, to follow the teachings of the prior art, but the treatment with ferrous sulphate, followed by the use of an excessive amount of hydrogen peroxide and the usual ursol dye.

As to shades 8, 12, and 30, the excessive use of hydrogen peroxide, after treatment with ferrous sulphate, is more pronounced, in that with shade No. 8, one thousand eight hundred times as much peroxide as dye was used, with shade No. 12, seventy times as much peroxide as dye was used, and with shade No. 30, four hundred times as much peroxide as dye was used, whereas normally but ten to twenty times as much hydrogen peroxide as dye is used.

It is thus obvious that the purpose was to bleach, and this was accomplished by the treatment with ferrous sulphate or its equivalent, followed by the use of an excessive quantity of hydrogen peroxide.

This was a mere colorable attempt at evasion of the patents, and the said defendants infringed both the process and product patents in suit.

As to the charge of infringement in the third above-entitled suit against William Beyer, Inc., et al., it is obviously sustained as to the product patent, and as to the process patent, it is clearly shown by the answers to the supplementary interrogatories.

The hydrogen peroxide bleaches the skin which has been treated in a bath of iron sulphate.

Again, there was not even an attempt to follow the teachings of the prior art. The process is substantially identical with that of the process patent in suit, and the product is that of the product patent in suit.

The defendants infringed both patents in suit.

As to the charge of infringement in the fourth above-entitled suit, against Samuel A. Karten et al., the proof of infringement by the defendants of both patents in suit is clear.

Mr. Karten finally admitted that in the treatment of the skins, Exhibits 4, 5, and 6, ferrous sulphate was used, and stated that thereafter they were dyed with a gross excess of hydrogen peroxide.

As in the other cases, it appears to me that, by the process described, the skins were bleached after treatment with ferrous sulphate, and it was a merely colorable attempt to evade the process patent in suit; the product being an undoubted infringement of the product patent in suit.

There was no attempt, even on the part of the defendants, to follow the teachings of the prior art.

The defendants infringed both patents in suit.

A decree may be entered in favor of the plaintiff against the defendants in each of the above-entitled suits with injunction, costs, and the usual order of reference.

Settle decrees on notice, and submit findings of fact and conclusions of law in each case for the assistance of the court, as provided in Equity Rule 11 of this district.