STEINFUR PATENTS CORPORATION v. MEISEL–GALLAND CO., Inc., et al.

SAME v. MICHAEL MILLER FUR DYEING CORPORATION et al.

Nos. 4941, 6512.

District Court, E. D. New York.

May 22, 1939.

Abel E. Blackmar, Jr., of New York City, special master.

Lemlein & Wolsky, of New York City (Morris H. Wolsky, of New York City, of counsel), for plaintiff.

Louis H. Solomon, of New York City, for defendants William E. Popkin and Michael Miller.

BYERS, District Judge.

Hearing on exceptions to report and findings made by Special Master to whom was referred the question of alleged violation of injunction and infringement by the individual defendants, William E. Popkin in the first cause and Michael Miller in the second.

The Special Master has found infringement as follows:

As to Popkin: Patent No. 1,573,200 (Process) at least as to claims 6, 7, 19, and 22. Patent No. 1,564,378 (Product) at least as to claims 1, 6, 11, 12, 14, 16, 21, and 22.

As to Miller: Patent No. 1,564,378 at least as to claims 11, 12, 14, and 16.

That each defendant has violated the injunction heretofore issued and served upon him.

The plaintiff excepts to the failure to find violations of other claims, and the defendants to the findings as made, on the general theory that no infringement is established by the evidence.

The findings result from a report which sufficiently discusses the issues and the tes-

timony to render unnecessary any extended comment upon either, in the disposition of these exceptions.

The scope and status of the patents have been expounded in Steinfur Patents Corporation v. J. Meyerson, Inc., et al., D.C., 56 F.2d 372, modified and affirmed sub nom Steinfur Patents Corporation v. William Beyer, Inc., et al., 2 Cir., 62 F.2d 238.

They have to do with a process for bleaching and dyeing furs (No. 1,573,200) and with the furs so bleached and dyed (No.1,564,378).

Validity and infringement were established in the above case, and the issue now presented has to do solely with the extent to which these defendants are to be deemed to be in contempt for having disobeyed the injunction issued and served upon them in connection with that decision.

It is necessary to recall that the plaintiff's process, stated broadly, consists in treating animal skins with ferrous sulphate ($FeSO_4. 7H_2O$) and then bleaching them by the application of hydrogen peroxide, after which they may be dyed as desired.

The defendants assert that their process avoids infringement because the ferrous sulphate used in the first stage of operation is changed, by intermediate introduction of an undisclosed chemical agent, into ferric sulphate ($Fe_2(SO_4)_3$) after which the bleaching is accomplished by the use of peroxide of hydrogen in an alkaline state, and that this is such a departure from the teaching of the process patent, that infringement of both patents is avoided and in consequence there is no violation of the injunction.

With that position, the Special Master does not agree, and no reason has been brought to light by the defendants' briefs to induce the court to reach a different conclusion.

The defendants' argument, stated briefly, is that a ferric rather than a ferrous mordant (fixing agent) was deemed to be desirable because superior bleaching qualities were thereby imparted to the skin; that to overcome the practical objections to that procedure, due to the deleterious effect of the ferric mordant upon the leather as distinguished from the hair of the skin, a method was perfected by Popkin's corporation, whereby the ferrous mordant initially employed was changed into a ferric state before the bleaching action was set up, and thus the desired result was accomplished.

Incidentally, the defendants refused to disclose the chemical constituency of the intermediate step, and it thereby became necessary for the Master to ascertain how far the defendants' assertions were sustained by the evidence, a process involving the taking of 1842 pages of testimony.

The argument proceeds to the general effect that the Master should not have reached the conclusion that the intermediate step did not accomplish its avowed object, since the bleaching of the defendants' skins was actually accomplished while the hairs were sufficiently impregnated by ferrous sulphate to indicate that the defendants' departure from the process of the plaintiff's patent was more apparent than real.

Under this contention, it is asserted that the tests for the presence of ferrous sulphate in the final stage were not sufficiently convincing to sustain the Master's conclusion on the subject. The record convincingly demonstrates the care with which he scrutinized the testimony as it went in and such experimentation as was conducted in his presence. He had to draw his conclusions by weighing the testimony of one expert against the other, and his report is not criticized as lacking in insight or understanding of the weight to be attributed to the argumentative as distinguished from the demonstrable elements in the case.

At best, the defendants are forced to assert that there was only a little ferrous sulphate present when the bleaching was undertaken.

Probably this means that the defendants should be permitted to infringe, just a little.

Stress is laid upon the alkali aspect of the bleaching solution employed by the defendants, who add alkalis to the peroxide of hydrogen to effect the bleach.

The argument is thus stated: "* * * so that the plaintiff's process starts out with hydrogen peroxide per se and ends with the hydrogen peroxide supplemented with ferrous sulphate, which is a compound of sulphuric acid." (So is ferric sulphate.)

But the patent does not teach the employment of an acid bleach. The pH of the bleach is not indicated in any of the claims.

The defendants next argue that, if the conversion which they say is accomplished,

of ferrous to ferric, prior to the bleach, is complete, the Master is in error in concluding that, in the operation of that process, the ferric sulphate is changed back to ferrous, resulting in the practice of the teaching of the patent. In other words, that he was misled by the views of the German scientist Simon whose exposition of that theory was accepted.

The argument is made that Simon is mistaken.

The court would naturally be more diffident to so conclude than counsel is in so contending.

The quotations from the Simon exposition which appear in defendants' brief are entirely consistent with an understanding, upon the writer's part, of the controversial aspect of the problem which confronted him; his willingness to assume responsibility for the conclusions arrived at by him, under these conditions, tends to vindicate the scholarship which he brought to bear, and to impart confidence to the acceptance of his reasoning.

The fact that the argument is addressed to the soundness of the Simon exposition, rather than to an attempt to minimize its importance to the defendants' case, somewhat points to a realization that the mere presence of the ferrous sulphate during the bleaching operation is of major consequence.

Study of and reflection upon the defendants' arguments have failed to produce any real misgiving as to the soundness of the findings of the Special Master.

Two aspects of the case seem to require brief comment:

The following concession of a prima facie showing by the plaintiff is recorded at page 151:

"* * * the plaintiffs have proved, with the weight and value of the evidence to be determined by the court at the conclusion of this hearing, that W. E. Popkin, Inc. use a solution of ferrous sulphate with which to treat the skins; that the ferrous sulphate is not converted into the ferric completely; and that there is a substantial quantity of ferrous compound in the skin so processed by W. E. Popkin, Inc. at the time it enters the bleach. * * * And that such proof upon the part of the plaintiff constitutes proof of the use by W. E. Popkin, Inc. of an infringing process."

That concession clearly put upon the defendants the burden of going forward with the evidence and overcoming the plaintiff's case so conceded.

Part of the defendants' effort consisted in producing skins treated by a secret process, and subjecting them to chemical analysis in order to determine whether the departure from the plaintiff's process was in fact what it was asserted to be.

A discussion of whether the burden of proof is to be distinguished from the burden of evidence, in these circumstances, becomes a mere quibble. The defendants undertook to prove a certain thing, and the Master says they failed to do it. One method open to them was to make a candid disclosure of their process, and then prove by competent testimony that their assertions were true. This they elected not to do, and if their showing was deemed to fall short of their assertions by a visible margin, their criticisms should be directed to their own procedure, rather than to its failure to persuade.

The defendants' cause might have suffered a handicap at the hands of a less discerning and careful Master, by the lamentable disclosure that one of its experts was willing to swear falsely concerning his scholastic qualifications. Joseph Caspe, being called and sworn as an expert for the defense, testified that he obtained the degree of Ph.D. from Fordham University in 1931—he offered to show his diploma. This was not a mere casual incident of his cross-examination, and accorded with his direct, in which he referred to post-graduate studies in biochemistry and inorganic chemistry "with the degree of Master of Science in 1929, with a doctorate in 1931".

From official sources, it was later proven that he failed in two examinations for the Doctor's degree, and it was never awarded to him by Fordham University.

The defendants' briefs wisely enough refrain from citation of this witness' testimony, and the incident is probably unimportant as far as the merits of the case are concerned, but the record indicates that Caspe continued to attend many of the hearings as a consultant of the defendants; thus the subject is appropriate for comment herein, for possible future reference.

The final argument for the defendants is, that since the Master has found that "the step in the process used by W. E. Popkin, Inc., of treating the fur skins in the so-called 'converting' solution was not

involved in any of the processes that have heretofore been held to infringe the Stein et al. patent No.1,573,200", the issues at bar should have been tried in an infringement action, not in a contempt proceeding. In other words, that the defendants have not been shown to have engaged in a "colorable" trespass upon the plaintiff's patents. The cases are collected in American Foundry & Mfg. Co. v. Josam Mfg. Co., 8 Cir., 79 F.2d 116 at page 118. See, also, Hartford-Empire Co. v. Obear-Nester Glass Co., 8 Cir., 95 F.2d 414, at page 417.

It is manifest that mechanical and sometimes electrical structures can be visually compared, in order to determine the presence or absence of "colorable" invasion as alleged. Where a chemical process is involved, the issue must largely turn upon a comparison of results, more particularly where reliance is had upon a so-called secret process to veil the appearance of precise simulation by a defendant of that which the plaintiff's patent teaches. As to this, finding 5 is quite specific:

"5. That the process of bleaching and dyeing fur skins, as carried out by W. E. Popkin, Inc., as above set forth, accomplished the same results as the process described in the patents in suit and accomplished it in the same way."

However expedient it may have seemed to the defendants not to disclose their process for commercial reasons, their adherence to that reticence cannot constitute avoidance of contempt proceedings. They were in the position to demonstrate freedom from colorable invasion of the plaintiff's patent, and chose not to do so. They cannot be heard to complain of the rather obvious inference to be drawn from that election.

Thus the exceptions of the defendants are overruled.

The plaintiff excepts to the failure of the Master to find infringement of claims in the two patents other than those referred to in his findings. Those exceptions will be reserved, in case this decision is found to be erroneous on appeal.

The Master's application for compensation reveals that there were forty-two half day sessions, during which 150 exhibits were offered in evidence. Ten days additional were spent in preparing the report and findings, including the study of briefs and conferring with counsel on the draft report. He suggests an allowance of $3,000 and, on the argument of the exceptions, counsel were invited to give the court the benefit of their views. One said he considered the amount fair and reasonable, and the other said he had no objection to offer.

The allowance of the Special Master will therefore be fixed at $3,000.

In connection with the settlement of the order disposing of the foregoing matters as indicated, counsel will please submit brief memoranda touching adequate and proper penalties to impose on these two individuals, for their contempt of the injunction of this court, citing authorities.

Settle order.